[No. 50097–5. En Banc. August 30, 1984.]

MICHAEL R. FOSTER, ET AL, *Appellants,* v. SUNNYSIDE VALLEY IRRIGATION DISTRICT, *Respondent.*

*Michael L. Everett* and *Frank W. Jenny,* for appellants.

*Charles C. Flower, Patrick Andreotti,* and *Flower & Andreotti,* for respondent.

UTTER, J.—Two issues are raised by this appeal from the trial court's grant of defendant/respondent's motion for summary judgment. First, is a 1915 contract for water rights entered into by appellants' and respondent's predecessors in interest binding on them today? Second, does RCW 87.03.045 and RCW 87.03.050, relating to a voting scheme for the irrigation district, violate Const. art. 1, § 19 by infringing on the right of suffrage? We conclude that the 1915 contract is binding on these parties and that RCW 87.03.045 and .050 unconstitutionally infringe upon appellants' right to vote under Const. art. 1, § 19.

The facts are basically undisputed. In 1915, appellants' predecessor, R. E. Wise, contracted with the United States government, on behalf of his "heirs, executors, administrators and assigns" for water rights for a 23.8–acre tract he owned in Benton County. The contract was made pursuant to the federal Reclamation Act "and acts amendatory thereof." He agreed to pay annual installments of $52 per acre of irrigable land for construction costs and additional operation and maintenance charges as prescribed by the act.

In 1945, the Sunnyside Valley Irrigation District (SVID) purchased the Sunnyside Canal and its appurtenant works from the United States and assumed its contractual obligations. *See generally Caruthers v. Sunnyside Vly. Irrig. Dist.,* 29 Wn.2d 530, 188 P.2d 136 (1947). It is now successor to the United States with regard to the 1915 Wise contract. Under its agreement with the United States, SVID assumed the obligation to operate and maintain all Reclamation Act irrigation works which extend from the Yakima

River to delivery boxes (weirs) within the district. There is one weir available for every 40 acres of irrigable land within the district.

Pursuant to its authority under RCW 87.03.240, SVID assesses landowners within the district for this service based on the availability of irrigation water to each acre multiplied by the number of acres owned plus administration costs. Parcels which are 1 acre or less are assessed a minimum charge based on the "benefit of water available." A weir was located appurtenant to Wise's property.

In 1972, Wise's farmland was subdivided and sold as residential lots. The plat for the subdivision failed to provide for irrigation water rights of way or pipelines to the lots from the weir (which was later required by RCW 58.17-.310); consequently, the lots do not have access to the water. Nevertheless they have been, and continue to be, assessed for irrigation.

Appellants purchased property from within that subdivision and petitioned the board of directors of SVID for exclusion of their property from the district. This request has been denied. Appellants are not eligible to vote for members of the board because in 1966 the district adopted a resolution pursuant to RCW 87.03.045 and .050 which provides that holders of title to land platted or subdivided into residential or business lots not being used for agricultural purposes cannot vote in SVID elections.

On August 28, 1981, appellants brought this action to declare RCW 87.03.045 and .050 unconstitutional on the basis they violate due process, equal protection and the right to suffrage and to enjoin SVID from further assessing their property or holding elections without their participation. Cross motions for summary judgment were filed. The trial court granted summary judgment for SVID and denied appellants' motion. Appellants appealed to the Court of Appeals which certified the case to this court.

I

Appellants first challenge the SVID's authority to assess

them under RCW 87.03.240. However, we need only reach this issue if we find that appellants are not bound by the terms of the 1915 contract.

The proviso to RCW 87.03.240 states that:

nothing herein shall be construed to affect or impair the obligation of any existing contract providing for a water supply to lands so assessed, unless the right under such contract shall first have been acquired by said district . . .

Appellants' predecessor, Wise, entered into his contract for irrigation water with the United States in 1915. The proviso to RCW 87.03.240 was first enacted in 1917. If the Wise contract is still binding on appellants it falls within the proviso and is controlling in this case.

The 1915 contract provides, in pertinent part:

1. I, R.E. Wise, in pursuance of the provisions of the Reclamation Act approved June 17, 1902 (32 Stat., 388), and acts amendatory thereof, and supplementary thereto, especially the act approved August 9, 1912 (37 Stat., 265) and the act approved August 13, 1914 (Public No. 170) known as the Reclamation Extension Act, all hereinafter called the Reclamation Law, and the rules and regulations established thereunder, do hereby apply on behalf of myself, *my heirs, executors, administrators and assigns,* for a water right for the irrigation of and to be appurtenant to 23.8 acres of irrigable land . . .

2. The measure of the water right for said land is that quantity of water which shall be beneficially used for the irrigation thereof . . .

3. I agree: (a) to pay the annual installments of the construction charge fixed by the Secretary of the Interior in public notice issued in connection with the unit above described on [the] 29th day of February, 1912, at $52.00 per acre of irrigable land, and *in addition thereto the annual charges for operation and maintenance as prescribed by the Reclamation Extension Act* . . . (b) that the construction charge, and *each and all of said annual charges for operation and maintenance with accrued penalties shall be and the same are hereby made a lien upon the tract of land above described* and all water rights now or hereafter appurtenant or belonging thereto

and all improvements now existing or hereafter made thereon . . .

(Italics ours.)

█ Appellants first contend that the Wise agreement is not a covenant which runs with the land and is not binding on them because privity is lacking in this case. Under Washington law, a water right is considered real property which is appurtenant to and passes with a conveyance of the land which receives its beneficial use. *See Ickes v. Fox,* 300 U.S. 82, 94, 95, 81 L. Ed. 525, 57 S. Ct. 412 (1937); *Drake v. Smith,* 54 Wn.2d 57, 337 P.2d 1059 (1959); *Caruthers v. Sunnyside Vly. Irrig. Dist., supra; Tedford v. Wenatchee Reclamation Dist.,* 127 Wash. 495, 499, 221 P. 328 (1923); *Geddis v. Parrish,* 1 Wash. 587, 21 P. 314 (1889).

In both *Caruthers* and *Tedford,* the court considered claims by successors in interest to contracts which conferred specific water rights and imposed obligations upon their predecessors in interest. In each case the court found the contract provisions binding on the successors in interest. *Caruthers* best illustrates the principles applicable here. There, the SVID attempted to charge landowners in excess of the amount they had contracted to pay for water under their original agreements with the United States. SVID had assumed the obligations of the United States when it purchased the irrigation district and the court held that, in assuming these obligations, the SVID had agreed to be bound by the preexisting contracts. It also held that the water rights under the original contract ran with and bound the land.

Under *Caruthers,* the SVID is bound by the 1915 contract between the United States and Wise and must provide water to the weir appurtenant to appellants' property continually. It would be anomalous, indeed, for us to hold that only the benefit of the original contract is applicable to appellants. The SVID is bound by the original contract terms and the appellants are as well.

The cases cited by appellants are distinguishable. In

*Model Water & Light Co. v. Dickson,* 174 Wash. 164, 24 P.2d 422, 28 P.2d 1119 (1933), the court refused to bind personally a successor to a similar contract where the contract language did not specifically state that the successors were bound to pay assessments. Rather, the court held that the contract operated to impose a lien on the land itself for payment of assessments, but did not bind the successors personally. In contrast, the 1915 Wise contract specifically provided that successors were bound to pay the assessments required under the Reclamation Act. The intention of the original parties to the instant contract and the adequacy of notice to their successors is not at issue here.

A result similar to that in *Model Water & Light Co.* was reached in *Faught v. Platte Vly. Pub. Power & Irrig. Dist.,* 155 Neb. 141, 51 N.W.2d 253 (1952), where the court relied, in part, upon the doctrine that "a contract will not be construed as imposing a perpetual obligation when to do so would be adverse to public interests", in holding that a contract giving plaintiff's predecessor access to water was not binding. *Faught,* at 150. Yet, the main ground upon which the *Faught* court reached its conclusion, that the district sought retroactively to insert binding provisions into the original contract, is clearly distinguishable here.

The 1915 Wise contract specifically incorporated into its terms the provisions of the 1914 Reclamation Act, 43 U.S.C. § 492, which provides, in part:

> In addition to the construction charge, every water-right applicant, entryman or landowner under or upon a reclamation project shall also pay, *whenever water service is available for the irrigation of his land,* an operation and maintenance charge based upon the total cost of operation and maintenance of the project, or each separate unit thereof, and such charge shall be made for each acre-foot of water delivered; *but each acre of irrigable land, whether irrigated or not, shall be charged with a minimum operation and maintenance charge based upon the charge for delivery of not less than one acre-foot of water.*

(Italics ours.)

Respondent maintains that the act gives it authority to assess appellants' property regardless of whether it is benefited by the water provided. Appellants, on the other hand, argue that the measure of the assessment that can be imposed upon each acre of land is subject to the actual benefit received. Alternatively they argue that their land is no longer "irrigable" within the meaning of the statute and they should be excused from performance of the contract.

Appellants' position that the act contains an implied condition that the irrigation provided must benefit the land is without support. The specific wording of the act permits a minimum maintenance charge regardless of whether the land is actually irrigated. It has been held that land need not be specifically benefited to be subject to maintenance and operation assessments under this statute. *Nampa & Meridian Irrig. Dist. v. Bond,* 268 U.S. 50, 54, 69 L. Ed. 843, 45 S. Ct. 383 (1925).

There is, however, an express condition within the statute which may no longer be satisfied here. The statute requires that each acre of land subject to a maintenance charge be "irrigable." Irrigable lands have been defined as "'lands which by reason of their level, relative to irrigation works, can have water carried over them therefrom by gravity and which, having regard to the character of the soil and of the climate, will be rendered more productive by means of irrigation properly applied in the growing of crops adapted to the locality.'" *Cabell v. Federal Land Bank,* 173 Or. 11, 23, 144 P.2d 297, 302 (1943); *accord, Klamath Irrig. Dist. v. Carlson,* 176 Or. 336, 157 P.2d 514, 517 (1945); *see also Biddick v. Laramie Vly. Mun. Irrig. Dist.,* 76 Wyo. 67, 299 P.2d 1059, 1064 (1956) (irrigable land means land which is suitable for irrigation and for which irrigation water is available).

In both *Faught v. Platte Vly. Pub. Power & Irrig. Dist., supra,* and *Cabell v. Federal Land Bank, supra,* contracts for irrigation waters were rescinded when the land became unirrigable. In *Faught* the groundwater rose and rendered irrigation unnecessary. In *Cabell,* the land became flooded,

largely due to seepage from the irrigation system, and was unfit for irrigation.

Respondent distinguishes both *Faught* and *Cabell* on grounds that there, the change in the land's suitability for irrigation was not the fault of the promisor to the contract. In this case, plaintiffs' predecessor chose to subdivide the land.

■ The doctrine of frustration of performance due to the cessation of a material condition only operates to excuse performance where it is not the fault of a party to the contract. *In re SEC*, 142 F.2d 411 (3d Cir. 1944), *aff'd sub nom. Otis & Co. v. SEC*, 323 U.S. 624, 89 L. Ed. 511, 65 S. Ct. 483 (1945); *Brenner v. Little Red Sch. House, Ltd.*, 302 N.C. 207, 274 S.E.2d 206 (1981); 17A C.J.S. *Contracts* § 464, at 622 (1963). Here, there is no dispute that Wise was responsible for subdividing the previously irrigable land into residential property. We do not believe that their predecessor's action should be disregarded and the doctrine applied to circumstances as they are now.

II

Appellants challenge the constitutionality of the district's voting scheme, and of the enabling statute, RCW 87.03.045. They maintain that the scheme violates the equal protection clause of U.S. Const. amend. 14, Const. art. 1, § 12, and Const. art. 1, § 19, by denying them the right to vote in district elections.

RCW 87.03.045 provides, in pertinent part:

A person eighteen years old, being a citizen of the United States and a resident of the state and who holds title or evidence of title to land in the district or proposed district shall be entitled to vote therein, except that any such person shall only be entitled to vote in a district comprising two hundred thousand or more acres, or in any other district to which this exception is made applicable as hereinafter provided, if he holds title or evidence of title to land other than land platted or subdivided into residence or business lots and not being used for agricultural or horticultural purposes, in which event, in a district comprising two hundred thousand or more

acres, he shall be entitled to one vote for the first 10 acres of said land or fraction thereof and one additional vote for all of said land over ten acres. Lands platted or subdivided into residence or business lots shall not be considered as being used for agricultural or horticultural purposes unless (1) used exclusively for such purposes (2) by the holder of title or evidence of title who shall reside thereon and (3) cultivate said lands as a farmer, gardener, or horticulturist.

RCW 87.03.050 permits districts containing less than 200,000 acres of land to make the restriction of voting rights provided by RCW 87.03.045 applicable to their district. In 1966, SVID passed a resolution adopting RCW 87.03.045.

Under the statute only those landowners whose property is used for agricultural or horticultural purposes may vote, no single landowner can have in excess of two votes (one vote for 1 to 10 acres and an additional vote for all remaining property). Appellants fall within the exception to the statute and are not permitted to cast even a fractional vote for SVID board members.

The right to vote is fundamental under both the United States and Washington Constitutions. *Reynolds v. Sims,* 377 U.S. 533, 12 L. Ed. 2d 506, 84 S. Ct. 1362 (1964); *Malim v. Benthien,* 114 Wash. 533, 196 P. 7 (1921). The Washington Constitution, unlike the federal constitution, specifically confers upon its citizens the right to "free and equal" elections. Const. art. 1, § 19. Because we find that the Washington Constitution goes further to safeguard this right than does the federal constitution, we base our decision here upon the Washington Constitution.

Const. art. 1, § 19 provides: "All Elections shall be free and equal, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." The Washington Constitution defines qualified electors as:

All persons of the age of eighteen years or over who are citizens of the United States and who have lived in the state, county, and precinct thirty days immediately pre-

ceding the election at which they offer to vote, except those disqualified by Article VI, section 3 of this Constitution, shall be entitled to vote at all elections.

Const. art. 6, § 1 (amend. 63).

All idiots, insane persons, and persons convicted of infamous crime unless restored to their civil rights are excluded from the elective franchise.

Const. art. 6, § 3.[1]

The meaning of the guaranty to "free and equal" elections can be ascertained, in some measure, by looking to the records of the constitutional convention, and the few cases which have discussed Const. art. 1, § 19.

The guaranty that "all Elections shall be free and equal" was adopted from the Oregon Constitution, which was, in turn, adopted from the Indiana Constitution. *Journal of the Washington State Constitutional Convention, 1889,* at 508 n.31 (B. Rosenow ed. 1962). The framers of the Washington Constitution added to this phrase the additional guaranty that "no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." At the convention, there were two motions to replace the word "equal" with an alternative word. Mr. Dyer moved to substitute "open" for "equal." Mr. Reed moved to substitute "impartial" for "equal." Mr. Lindsley moved to strike the entire section. Each of these motions failed. At least one delegate, Mr. Moore, believed that "equal" meant the same thing as "free." *Journal, supra* at 508.

The earliest case to consider Const. art. 1, § 19 was *Malim v. Benthien, supra.* There the issue was whether the diking and drainage act of 1913, Rem. Code § 4107, uncon-

---

[1]Originally, the franchise included males 21 years or over and excluded Indians not taxed. Const. art. 6, § 1. In 1896, the constitution was amended to require further that all electors be able to read and speak English. Const. art. 6, § 1 (amend. 2). In 1910, the franchise was expanded to include women. Const. art. 6, § 1 (amend. 5). Finally, in 1974, the minimum voting age was reduced to 18 years or over and both the exclusion of "Indians not taxed" and the requirement that electors be able to read and speak English were deleted.

stitutionally denied persons living outside a water district, but subject to district assessments, the right to vote. The court determined that the only difference between those persons entitled to vote and those not so entitled was that the former group lived within the district's boundaries while the latter lived outside. This distinction lacked sufficient merit to deprive those outside the district of the right to an equal vote under the privileges and immunities clause of Const. art. 1, § 12 and Const. art. 1, § 19. *Cf. King Cy. Water Dist. 54 v. King Cy. Boundary Review Bd.,* 87 Wn.2d 536, 547, 554 P.2d 1060 (1976) (where a voting scheme limiting the right to vote in general municipal elections to city residents under Const. art. 1, § 12 was found constitutional, although the municipality managed a water district affecting those outside city boundaries, because adequate safeguards existed to protect those outside the city and "city residents [were] substantially affected by all city actions, not just its management of the water system").

Const. art. 1, § 19 was next considered in *State v. Wilson,* 137 Wash. 125, 241 P. 970, 43 A.L.R. 1263 (1925), which involved a criminal action for libel. Defendants, there, had signed a recall petition against a public official containing serious accusations which the trial court found untrue and malicious. They claimed they were immune from prosecution under Const. art. 1, § 19. The court responded by setting forth those activities *not protected* by the provision.

> The provisions of § 19, Article I of the constitution, that all elections shall be free and equal, etc., cannot prevent the application of criminal laws to the violation of criminal statutes. *The provision does not mean that voters may go to the polls at any time and vote on any question they see fit,* but only at the stated times provided by the statutes relating to elections. Neither does it mean that voters, in the free exercise of the right of suffrage, may vote as many times upon any one question or candidacy as they see fit; although a literal construction of the language of § 19 might lead to that. *It does not mean that elections and voters may not be regulated*

*and properly controlled.* It does not mean that voters may not be prosecuted for violation of any provision of the election laws which they may have violated either before or after such elections. It does not mean that the ordinary penal laws are set aside in favor of the recall laws or the free exercise of the suffrage. Nor, in our opinion, does it mean that voters are given *carte blanc* the privilege of making any allegations or statements concerning any officer sought to be recalled regardless of the truth or probable truth thereof, and wholly out of malice on the part of the malicious persons as to such officers.

(Italics ours.) *Wilson,* at 132–33.

One of the latest cases to apply Const. art. 1, § 19 is *Carstens v. PUD 1,* 8 Wn.2d 136, 111 P.2d 583, *cert. denied,* 314 U.S. 667 (1941). There, the Lincoln County public utility district sought to take, by eminent domain, property owned by a private utility company. Plaintiffs owned property in Spokane and Grant Counties which defendant sought to condemn. They claimed, in part, that permitting the district to condemn transmission lines in Spokane and Grant Counties violated Const. art. 1, § 19 because persons in those counties were not able to vote on this issue. The court rejected this contention on grounds that persons in those counties had no property or other real interest in the existing service. "The minute losses which the individual customers might suffer as a result of the removal of the property from the tax rolls would probably be counteracted by savings realized in power rates." *Carstens,* at 152. *Accord, Orchard Grove Water Ass'n v. King Cy. Boundary Review Bd.,* 24 Wn. App. 116, 120, 600 P.2d 616 (1979) (Const. art. 1, § 19 "is violated only when the property rights of persons are affected in more than an incidental way by a municipal corporation in which they have no right to vote").

This history offers several principles applicable here. The right of all constitutionally qualified citizens to vote is fundamental to our representative form of government. In most instances any legislative act which qualifies this right

must, under federal law, be based upon a compelling state interest and the state must demonstrate that no less restrictive measures are available to achieve this interest. *Reynolds v. Sims,* 377 U.S. 533, 12 L. Ed. 2d 506, 84 S. Ct. 1362 (1964). The language of Const. art. 1, § 19 is not to be interpreted literally: "elections and voters may . . . be regulated and property controlled"; in certain limited situations, the right to vote on an issue or for a representative may be confined to those persons directly affected by the issue or representative body. *State v. Wilson, supra* at 132–33.

■ The United States Supreme Court has departed from the strict 1–person, 1–vote rule of *Reynolds v. Sims, supra,* where the election of representatives in special purpose municipal districts is concerned. *See Salyer Land Co. v. Tulare Lk. Basin Water Storage Dist.,* 410 U.S. 719, 35 L. Ed. 2d 659, 93 S. Ct. 1224 (1973); *Ball v. James,* 451 U.S. 355, 68 L. Ed. 2d 150, 101 S. Ct. 1811 (1981). This is due to the limited governmental powers possessed and exercised by these districts and the disproportionate impact such districts frequently have upon a definable class living within their boundaries.

The supremacy clause, U.S. Const. art. 6, *see also* Const. art. 1, § 2, requires that we satisfy the Supreme Court's test for departure from the strict rule of *Reynolds v. Sims, supra.* It is useful, therefore, to set forth the federal analysis to calm any fears that we might be subverting the federal guaranty under the guise of interpreting our own constitution, rather than going beyond the confines of the federal constitution on state constitutional grounds.

In *Salyer* and *Ball,* the Supreme Court set forth the test for determining when statutes governing the election of representatives in special purpose municipal districts are exempt from the strict scrutiny to which the regulation of voting rights is normally subjected. In each case, the Court looked to whether the type of authority exercised by the limited purpose district was governmental in nature. Factors considered were the district's ability to impose taxes,

enact laws governing the conduct of citizens or "administer such normal functions of government as the maintenance of streets, the operation of schools, or sanitation, health, or welfare services." *Ball,* at 366. Once the Court was satisfied that the district's authority was limited to facilitating a nongovernmental purpose, it inquired only whether the voting scheme at issue was reasonable.

In *Salyer,* the Court upheld a statute which gave greater influence in water district elections to those voters most affected by the district's operations. Specifically, the statute permitted only landowners to vote in general district elections and apportioned these votes according to the assessed valuation of the land. The cost of the district's projects were assessed against the land according to the benefits received. The Court reasoned that, because the district exercised little governmental authority, the requirements of *Reynolds v. Sims, supra,* were inapplicable. It then found the Legislature's apportionment scheme reasonable because the burden of assessments generally impacted landowners unequally, according to the size of their land holdings.

In *Ball,* the Court considered the nongovernmental activities of the water district and the primary purpose originally served by the district's organization. Once it had characterized the district's primary purpose the Court looked to the persons most significantly impacted by this purpose. The Court held that the federal constitution would permit a franchise limited to those most affected. It then found reasonable and upheld a voting scheme which limited the right to vote in water district elections to landowners and apportioned voting power according to the number of acres owned.

██ We find the *Ball* Court's analysis inconsistent with Const. art. 1, § 19 as interpreted by *Malim* and *Carstens.* The *Ball* Court's narrow focus upon the original irrigation purpose of the district caused it to recognize only the interests of landowners. Yet the district also generated and supplied electricity to approximately 240,000 consumers and derived 98 percent of its total operating revenue from

this activity. Thus, nonlandowners, too, were significantly affected by the district's policies. The cost of the district's "primary function" of providing irrigation water for agriculture was borne by many who had no voice whatever in district policy. *Ball*, at 381–85 (White, J., dissenting).

While it is consistent with Const. art. 1, § 19 to permit limited electoral qualifications in special purpose districts where their activities are largely nongovernmental in nature, and where the issue being voted upon disproportionately affects a definable class, *State v. Wilson, supra,* it demands that those constitutionally qualified electors who are significantly affected by district decisions be given an opportunity to vote for the representative of their choice in district elections. *Malim v. Benthien, supra.* Whether the right to vote is in fact so apportioned is subject to strict judicial scrutiny.

We find that SVID does not possess the general governmental powers which require imposition of the 1–person, 1–vote rule of *Reynolds v. Sims, supra.* Although the district has broad authority to develop and maintain a system for delivery of irrigation water and generation of electricity, RCW 87.03.015, it is not empowered to impose ad valorem property or sales taxes, enact laws governing the conduct of citizens or administer the normal functions of government.

While the record before us is inadequate to permit a determination of the district's actual impact upon its residents, we note that its statutory authority is broad and its potential impact is great. Appellant residential landowners living within the Wise subdivision are directly and significantly affected by the district's operation. The district's voting scheme has denied them their right to vote in violation of Const. art. 1, § 19 and Const. art. 6, § 1 (amend. 63). Accordingly, the district must hereafter permit those citizens living within the Wise residential subdivision to vote in district elections. It must also repay appellants the moneys assessed on their property for the period during which they were denied this right.

Can the district constitutionally accord greater weight to

votes cast by some members of the class directly affected by district operations than it does to other members of this class? We find the federal rationale for upholding such voting schemes consistent with Const. art. 1, § 19. Such schemes are based upon the allocation of burden upon residents within the district. Those residents receiving more of the burden are entitled to a greater say in the district's operation. *See, e.g., Salyer Land Co. v. Tulare Lk. Basin Water Storage Dist., supra.* The allocation reflected in the legislative scheme here is inadequate, however, under Const. art. 1, § 19, because it does not account for a class of persons significantly affected by the district's operations. It gives them no voice. Once the Legislature has determined the district's relative impact upon definable classes within its boundaries, it may apportion votes according to this impact.

We hold, therefore, that RCW 87.03.045 violates the Washington constitutional guaranty of free and equal suffrage. The judgment is reversed in part and respondent is ordered to remit to appellants all assessments taken while they were denied the right to vote in district elections.

WILLIAMS, C.J., and ROSELLINI, BRACHTENBACH, DOLLIVER, DORE, DIMMICK, and PEARSON, JJ., concur.

Reconsideration denied November 13, 1984.