LOUIS S. GOLDSTEIN *et al.*, Plaintiffs-Appellants, v. JAMES MITCHELL, Indiv. and as Commissioner of Union Drainage District No. 1, Lake County, *et al.*, Defendants-Appellees.

Second District   No. 2—85—0125

Opinion filed June 20, 1986.

Michael A. Kreloff, of Louis S. Goldstein & Associates, of Chicago, for appellants.

Robert S. Baizer, Linda Coffing Vogler, and Richard Kessler, all of Marder, Baizer & Sklar, of Highland Park, for appellees.

JUSTICE HOPF delivered the opinion of the court:

Plaintiffs, Louis Goldstein and Florence Fine, appeal from a trial court order entering summary judgment in favor of all defendants and against all plaintiffs pursuant to plaintiffs' and defendants' cross-motions for summary judgment. In their motion plaintiffs challenged the constitutionality of certain voting provisions found in section 4—5 of the Illinois Drainage Code (Code) (Ill. Rev. Stat. 1983, ch. 42, par. 4—5), challenged an election held pursuant to section 4—5 of the Code, and sought damages under 42 U.S.C.A. sec. 1983 (West 1981). On appeal, plaintiffs assert: (1) that section 4—5 of the Code is unconstitutional because it violates the equal protection clauses of both the United States and the Illinois constitutions; (2) that section 4—5 is unconstitutionally vague; (3) that the challenged election was conducted in a manner which denied plaintiffs due process; and (4) that the trial court erred in ruling that plaintiffs lacked standing to sue under 42 U.S.C.A. sec. 1983 (West 1981).

Union Drainage District No. 1 (district) is a statutory entity created and operated pursuant to the Illinois Drainage Code (Ill. Rev. Stat. 1983, ch. 42, par. 1—1 et seq.). The district consists of territory lying within Lake County and Cook County. It is governed by a three-member board of commissioners who are elected for three-year terms. The Union Drainage District No. 1 Board of Commissioners is a defendant in this case.

On September 6, 1983, an election was held to elect one of the three district commissioners. The candidates were defendant James Mitchell, an incumbent, and plaintiff Louis Goldstein, a resident landowner in the district.

The election was held in a single polling place, a local school, between 2 p.m. and 4 p.m. Absentee ballots had not been made available for the election. Three residents of the village of Deerfield, who were appointed by the board of commissioners, sat as judges of the election. Incumbent Mitchell was present at the polling place throughout the election, acting as his own poll watcher. Most of the time he sat in a chair about 10 feet away from both the judges and the polling booth. Mitchell had brought with him photographs and a report on work being done on the west fork of the north branch of the Chicago River under the authority of the district. Mitchell said that he was studying the report in preparation for a drainage-district meeting to be held the night of the election. He spoke with and showed the photos to some of the voters who came into the polling place and addressed him, although he did not leave his chair to do so. He said that when he wished to speak to somebody he would step outside the poll-

ing place.

Voters were asked to sign an affidavit of voter qualification before being given a ballot. Only people who owned land in the district were allowed to vote. Plaintiff Florence Fine, a tenant residing in the district, but who did not own any land in the district, was not allowed to vote. Of the approximately 8,000 landowners of the district, 226 voted. Mitchell received 130 votes and Goldstein received 89.

Plaintiffs filed an action challenging the constitutionality of both the September 6 election and the voting provisions in section 4—5 of the Code. They also sought class certification for those not allowed to vote in the election and asked for damages pursuant to 42 U.S.C.A. sec. 1983 (West 1981). Ultimately, the parties filed cross-motions for summary judgment. On August 22, 1984, the court granted plaintiffs' emergency motion for an injunction staying the September 1984 election for district commissioners. On January 16, 1985, the trial court denied plaintiffs' motion for summary judgment and granted defendant's cross-motion, and the injunction was dissolved. Although the court did not resolve the issues pertaining to class certification, it did make the following findings: (1) section 4—5 of the Code is constitutional on its face; (2) section 4—5 of the Code is constitutional as it was applied to the September 6, 1983, election; (3) the September 1983 election was appropriate; and (4) plaintiffs do not have standing to sue for violations of 42 U.S.C.A. sec. 1983 (West 1981). This appeal followed.

█ Plaintiffs' first argument is that section 4—5 of the Code limits the franchise to a class of voters in violation of the equal protection clauses of both the State and Federal constitutions. The relevant portions of section 4—5 state:

"Commissioners *** shall be elected by the adult owners of land in the district ***.

\* \* \*

Every adult owner of land in the district shall be entitled to vote.

\* \* \*

[If an unexpired term caused by a vacancy is for more than one year] the adult landowners shall elect a commissioner to complete the *** term ***." (Ill. Rev. Stat. 1983, ch. 42, par. 4—5.)

Section 1—2 sets forth the following definitions:

" 'Landowner' or 'owner' means the owner of real property and includes an owner of an undivided interest, a life tenant, a remainderman and a trustee under an active trust but does not include a mortgagee, a trustee under a trust deed in the nature

of a mortgage, a lien holder or a lessee.

'Adult landowner' or 'adult owner' includes public and private corporations." Ill. Rev. Stat. 1983, ch. 42, pars. 1—2(i), (j).

The system for electing drainage district commissioners set out in section 4—5 limits voting eligibility to owners of land located within the district. Residency is not a voting requirement. Nor does residency guarantee the right to vote. This case requires us to determine whether this particular voting system may be an exception to the strict demands of the one-person, one-vote principle imposed by the equal protection clause of the fourteenth amendment to the United States Constitution and echoed in the Constitution of the State of Illinois.

*Reynolds v. Sims* (1964), 377 U.S. 533, 12 L. Ed. 2d 506, 84 S. Ct. 1362, recognized that the right to vote is an important political right;. established the one-person, one-vote principle; and applied it to elections of State legislatures. *Avery v. Midland County* (1968), 390 U.S. 474, 20 L. Ed. 2d 45, 88 S. Ct. 1114, extended the *Reynolds* rule to an election of county governmental officials, holding that county officials exercised "general governmental powers over the entire geographic area served by the body." (390 U.S. 474, 485, 20 L. Ed. 2d 45, 53, 88 S. Ct. 1114, 1120.) The court continued to apply and expand the *Reynolds* rule to elections in governmental entities which it perceived as performing traditional, vital governmental functions (*Kramer v. Union Free School District No. 15* (1969), 395 U.S. 621, 23 L. Ed. 2d 583, 89 S. Ct. 1886 (local school elections); *Hadley v. Junior College District* (1970), 397 U.S. 50, 25 L. Ed. 2d 45, 90 S. Ct. 791 (election of trustees of community college district)), or as having and exercising the full range of normal governmental powers (*Hill v. Stone* (1975), 421 U.S. 289, 44 L. Ed. 2d 172, 95 S. Ct. 1637 (bond election to finance a city library); *Phoenix v. Kolodziejski* (1970), 399 U.S. 204, 26 L. Ed. 2d 523, 90 S. Ct. 1990 (general-obligation bonds secured by property-tax revenues); *Cipriano v. City of Houma* (1969), 395 U.S. 701, 23 L. Ed. 2d 647, 89 S. Ct. 1897 (bond election for benefit of municipal utility system)).

At the same time the court was exploring the scope of the *Reynolds* rule, it was leaving room for an exception. In the early case of *Avery v. Midland County* (1968), 390 U.S. 474, 20 L. Ed. 2d 45, 88 S. Ct. 1114, where *Reynolds* was extended to county elections, the court reserved decision on the application of *Reynolds* to "a special-purpose unit of government assigned the performance of functions affecting definable groups of constituents more than other constituents." (390 U.S. 474, 483-84, 20 L. Ed. 2d 45, 53, 88 S. Ct. 1114, 1120.) The

court further defined what elections might be exempt from *Reynolds* in *Hadley v. Junior College District* (1970), 397 U.S. 50, 25 L. Ed. 2d 45, 90 S. Ct. 791, where it was stated:

"It is of course possible that there might be some case in which a State elects certain functionaries whose duties are so far removed from normal governmental activities and so disproportionately affect different groups that a popular election in compliance with Reynolds *** might not be required ***." (397 U.S. 50, 56, 25 L. Ed. 2d 45, 51, 90 S. Ct. 791, 795.)

The court found such a case in *Salyer Land Co. v. Tulare Lake Basin Water Storage District* (1973), 410 U.S. 719, 35 L. Ed. 2d 659, 93 S. Ct. 1224.

*Salyer* involved a water storage district which encompassed 193,000 acres of fertile agricultural land, 85% of which were farmed by one or another of four corporations. Seventy-seven people lived in the area and most worked for the owner corporations. Under California law, the Tulare district could acquire, divert, store, conserve, and distribute water and generate and sell any form of power to support its water operations. The district was not generating and selling power. The costs of district projects were assessed against each landowner according to the water benefits the landowner received. Only landowners could vote for directors of the district and voting power was apportioned according to the assessed valuation of the voting landowner's property. This voting scheme was the subject of a constitutional challenge. The court held that the one-person, one-vote rule of *Reynolds* did not apply because the district satisfied both parts of a two-pronged test for exceptions to the rule. First, the court focused on the special, limited purpose for the district's existence and, second, the court examined the disproportionate effect of the district's activities on landowners.

The *Salyer* court recognized that the Tulare district did exercise some typical governmental powers, including the power to hire and fire workers, contract for construction projects, condemn private property, and issue general-obligation bonds. Nevertheless, the court concluded that the district actually had relatively limited authority as shown by its limited purpose of providing water for farming in the Tulare Lake Basin. The court noted that the district did not provide general public services such as schools, housing, transportation, utilities, roads, or anything else of a type "ordinarily financed by a municipal body." *Salyer Land Co. v. Tulare Lake Basin Water Storage District* (1973), 410 U.S. 719, 729, 35 L. Ed. 2d 659, 667, 93 S. Ct. 1124, 1130.

In developing the second part of the test, the *Salyer* court noted that costs were assessed in proportion to benefit received, charges for services were made in proportion to services rendered, and delinquent payment of charges and assessments became a lien on the land. The court found that the district's economic burdens could not affect the residents as residents, but did disproportionately affect landowners.

After concluding that the Tulare district's limited purpose and authority, as well as its disproportionate effect on landowners, exempted it from the strict *Reynolds* rule of one-person, one-vote, the court inquired whether the statutory voting scheme based on land ownership was related to achievement of the goals of the statute. The court determined that the California legislature could have reasonably assumed that the landowners would not have subjected their lands to the liens of assessment by which the district was to be financed unless they had a dominant voice in its control. Since the landowners were to bear the financial burdens, the State could conclude that the landowners also should have the responsibility for operating the district. The *Salyer* court found no violation of equal protection.

A companion case to *Salyer*, *Associated Enterprises, Inc. v. Toltec Watershed Improvement District* (1973), 410 U.S. 743, 35 L. Ed. 2d 675, 93 S. Ct. 1237, was decided the same day as *Salyer* and upheld a Wyoming statute which also contained a voting scheme based on land ownership. The court found that the Wyoming statute paralleled the statute in *Salyer* and upheld it on the same grounds.

In its latest pronouncement on statutory limits on the franchise in special-purpose governments, the United States Supreme Court has significantly expanded the scope of the exceptions to *Reynolds*. In *Ball v. James* (1981), 451 U.S. 355, 68 L. Ed. 2d 150, 101 S. Ct. 1811, the court upheld an Arizona statute which limited voting in elections for directors of agricultural improvement and power districts to owners of more than one acre of land in the district, and weighted the votes in proportion to acreage owned. The court found that the district involved in *Ball* met the two-pronged test developed in *Salyer* for determining exceptions to the one-person, one-vote rule set out in *Reynolds*. According to the court, the district's purposes were sufficiently specialized and narrow and its activities so disproportionately affected landowners that its limitation on the franchise was constitutionally permissible.

The court upheld the voting scheme in *Ball* even though the subject district, in addition to storing and delivering untreated water to 236,000 acres of land, almost completely subsidized its water operations by generating and selling electricity to hundreds of thousands of

people in an area including a large part of metropolitan Phoenix. The district also had power to condemn land, sell tax-exempt bonds, and engage in flood control and environmental-management projects. The court said that the differences between the more extensive and diverse functions of the district in *Ball* and that of the water district in *Salyer* did not amount to a constitutional difference.

The *Ball* court acknowledged that the water district there, which was originally formed to service agricultural land, now delivered roughly 40% of its water to urban areas or for nonagricultural purposes; that the district included almost one-half of the population of the State; and that district operations were financed, not by landowners, but by revenue from sales of electric power. Nevertheless, the court focused heavily on the original, limited purposes of the district and said: "The District simply stores water behind its dams, conserves it from loss, and delivers it through project canals." (*Ball v. James* (1981), 451 U.S. 355, 367, 68 L. Ed. 2d 150, 160-61, 101 S. Ct. 1811, 1819.) The court insisted that the district did not exercise the sort of governmental powers which invoke the demands of *Reynolds* and specifically named the things the district could not do: impose *ad valorem* property taxes or sales taxes, pass laws governing citizen conduct, maintain streets, operate schools, provide sanitation, health, or welfare services. In a footnote, the court reminded that in *Salyer* it had recognized that the following powers do not amount to general governmental authority either: power to contract and staff projects, condemn property, issue bonds, and levy and collect special assessments.

The court responded, also in a footnote, to appellant's assertion that the district engaged in flood-control activities which affected all residents and thus invoked *Reynolds*. The court's response discounted such activities as merely incidental to the district's primary water functions and said they were not of decisive constitutional significance. Nor was it significant for constitutional purposes that a high percentage of the district's water was used for nonagricultural purposes. What the court did find constitutionally relevant was the fact that the water delivered by the district was distributed according to land ownership. The court characterized water districts as "essentially business enterprises, created by and chiefly benefitting a specific group of landowners" and added that "the nominal public character of such an entity cannot transform it into the type of governmental body for which the Fourteenth Amendment demands a one-person, one-vote system of election." *Ball v. James* (1981), 451 U.S. 355, 368, 68 L. Ed. 2d 150, 161, 101 S. Ct. 1811, 1819.

The court was not persuaded either by the size of the district's power operation or the number of people affected. As it had done with flood control, the court found the power operation merely incidental to the district's main purpose and described the relationship between nonvoting resident power purchasers and the district as one between consumers and a business enterprise. The court concluded that the district's functions were of the narrow, special sort which exempted it from the demands of *Reynolds*. The opinion added that those who are allowed to vote in district elections are those who are disproportionately affected by district functions because their lands are subject both to liens to secure district bonds and to the acreage-based taxing power of the district, and they are the only ones who ever pay stock assessments. Thus, the *Ball* district met the *Salyer* test. Moreover, the district voting scheme bore a reasonable relationship to its statutory objectives since the owners might never have pledged their land for the benefit of the district without the promise of control of district business. As in *Salyer*, the *Ball* voting scheme was not offensive to Federal equal protection.

Whether the voting restriction challenged here is offensive to equal protection under the United States Constitution depends upon whether or not it fits into the exception carved out of the one-man, one-vote rule in *Salyer* and *Ball*. Application of the two-part *Salyer/Ball* test in the instant case requires an inquiry into the purposes of an Illinois drainage district and identification of those affected by the operation of such districts. Section 3—1 of the Code states:

> "Drainage districts may be formed to construct, maintain or repair drains or levees or to engage in other drainage or levee work for agricultural, sanitary or mining purposes." (Ill. Rev. Stat. 1983, ch. 42, par. 3—1.)

A drainage system is defined in section 1—2(g) of the Code:

> " 'Drainage system' means the system by which lands are drained or protected from overflow or both and includes drains, drainage structures, levees and pumping plants." (Ill. Rev. Stat. 1983, ch. 42, par. 1—2(g).)

According to section 1—2(o) of the Code:

> " 'Sanitary purposes' includes, but is not restricted to, the protection of residential, commercial and industrial property from inundation and overflow." Ill. Rev. Stat. 1983, ch. 42, par. 1—2(o).

The early case of *Corcoran v. Mud Creek Drainage District* (1929), 336 Ill. 211, 219, 168 N.E. 509, explained that drainage districts are organized "to drain the lands of the particular district, to

protect them from overflow by the construction of drains, ditches, levees, pumping stations, and by whatever means the situation and circumstances of the district make necessary and desirable for this purpose." Under the Illinois Drainage Code (Ill. Rev. Stat. 1983, ch. 42, par. 1—1 *et seq.*) drainage district commissioners are empowered to hire staff, contract, and sue and be sued in the corporate name of the district (Ill. Rev. Stat. 1983, ch. 42, par. 4—14); protect environmental values and prevent erosion and pollution of land, water and air (Ill. Rev. Stat. 1983, ch. 42, par. 4—15.1); exercise the power of eminent domain (Ill. Rev. Stat. 1983, ch. 42, par. 4—17; levy assessments (Ill. Rev. Stat. 1983, ch. 42, par. 4—18); sell (Ill. Rev. Stat. 1983, ch. 42, par. 4—28) and lease (Ill. Rev. Stat. 1983, ch. 42, par. 4—30) property; incur debt (Ill. Rev. Stat. 1983, ch. 42, par. 6—5); and annex or detach lands (Ill. Rev. Stat. 1983, ch. 42, par. 8—1). They also have power to provide for collection and disposal of sewage from the district's system for purposes of controlling water pollution and protecting public health. Ill. Rev. Stat. 1983, ch. 42, par. 473.

Although the record says little about the purposes of Union Drainage District No. 1, James Mitchell said at his deposition that the district basically handles stormwater runoff within the district, maintains the west fork of the north branch of the Chicago River, and is concerned with floods and the floodplain in the district and the movement of water across the watershed until it reaches the main channel.

We find that Illinois drainage districts are created primarily to manage erosion and flooding problems within the district. These purposes appear to be special and narrow enough to satisfy the first part of the *Salyer/Ball* test, especially since drainage districts cannot do any of the things *Ball* characterized as "the sort of governmental powers that invoke the strict demands of *Reynolds*." (*Ball v. James* (1981), 451 U.S. 355, 366, 68 L. Ed. 2d 150, 160, 101 S. Ct. 1811, 1818.) For example, drainage district cannot impose *ad valorem* property taxes or sales taxes, enact laws to govern citizen conduct, or maintain streets, schools, or health and welfare services. Moreover, the functions of the district here are far narrower in scope than those of the water district in *Ball* (*e.g.*, the district there provided electricity to half of Phoenix, Arizona).

While it was argued in both *Salyer* and *Ball* that flood control affected all residents of a district, and not just landowners, the court refused in both cases to find that such activity triggered a constitutional barrier to a limited franchise. The *Salyer* court found that flood control was merely incidental to the district's primary purpose. (*Salyer Land Co. v. Tulare Lake Basin Water Storage District* (1973), 410

U.S. 719, 728 n.8, 35 L. Ed. 2d 659, 666-67 n.8, 93 S. Ct. 1224, 1230 n.8.) In *Ball*, however, while the court again characterized the district's flood-control function as incidental to its water functions, the court also noted that in both *Salyer* and its companion case, *Associated Enterprises, Inc. v. Toltec Watershed Improvement District* (1973), 410 U.S. 743, 35 L. Ed. 2d 675, 93 S. Ct. 1237, control of erosion and flooding was one of the express statutory purposes of the water districts. (*Ball v. James* (1981), 451 U.S. 355, 367 n.12, 68 L. Ed. 2d 150, 161 n.12, 101 S. Ct. 1811, 1819 n.12.) Flood control as an express purpose had not been discussed in *Salyer* or *Toltec*. Nevertheless, the *Ball* court implied that even where flood control is an express purpose of a district, it is probably not enough to prohibit a voting classification. Thus, we find that even though the drainage district here is primarily concerned with flood and erosion control, the district's purposes are sufficiently narrow to fall into the *Salyer/Ball* exception to the rule of one-man, one-vote.

Petitioner repeatedly asserts that Union Drainage District No. 1 also has a sewage disposal and public health function. But that function is clearly incidental to, and in fact rises from, its drainage duties. (See Ill. Rev. Stat. 1983, ch. 42, par. 473.) As noted above, under both *Salyer* and *Ball*, incidental functions will withstand constitutional challenge.

The statute at bar also meets the *Salyer/Ball* requirement for disproportionate effect on the class allowed to vote. The Code provides that land must be assessed in proportion to the benefits received from district projects (Ill. Rev. Stat. 1983, ch. 42, par. 5—1) and that the assessment constitutes a lien upon the land (Ill. Rev. Stat. 1983, ch. 42, par. 5—17). Thus, the financial burdens of the district are placed squarely on the landowners along with control of the district as expressed through their vote. Furthermore, the benefit of both the erosion control and drainage functions, while certainly contributing to flood control, will most likely be of a more direct and immediate benefit to the individual owner whose land is either preserved or made usable.

In summary, the statute challenged here has resulted in a governmental entity sufficiently limited in purpose and having a sufficiently disproportionate effect on the class of voters it creates to be an exception to the one-person, one-vote requirement imposed by the equal protection clause of the fourteenth amendment. Moreover, the voting plan incorporated in the statute is adequately related to the statutory goals. The Illinois legislature could have reasonably assumed that landowners would not have subjected their lands to assessments to finance district

projects, or to assessment liens upon their lands, unless they also had control over the district. The legislature could have concluded that those bearing the financial burden of the district should be responsible for its operation. *Salyer Land Co. v. Tulare Lake Basin Water Storage District* (1973), 410 U.S. 719, 35 L. Ed. 2d 659, 93 S. Ct. 1224.

Plaintiffs urge that in the event we find the challenged franchise limitation is not prohibited by the Federal Constitution, we should find it barred by the Illinois Constitution. They offer for our consideration *Foster v. Sunnyside Valley Irrigation District* (1984), 102 Wash. 2d 395, 687 P.2d 841, the only post-*Ball* case cited to us. In *Foster*, the Supreme Court of Washington found that the Washington Constitution goes further to safeguard the right to vote than does the Federal Constitution and held a statutory franchise limitation unconstitutional under the State Constitution. Relying on "free and equal" language in the State Constitution, the legislative history of the State Constitution, and State court precedents, the *Foster* court rejected *Ball's* "narrow focus upon the original irrigation purpose of the district" which "caused it to recognize only the interests of landowners" (102 Wash. 2d 395, 409, 687 P.2d 841, 849), and focused instead on all of those persons who were "directly and significantly affected" (102 Wash. 2d 395, 410, 687 P.2d 841, 850) by district policies. The court concluded that the State Constitution required that those "significantly affected" be allowed to vote in district elections.

Article III, section 3, of the Illinois Constitution, like the Washington State Constitution in *Foster*, states: "All elections shall be free and equal." (Ill. Const. 1970, art. III, sec. 3.) But our research has revealed no precedent indicating that the Illinois Constitution calls for more than the Federal Constitution in relation to equal protection safeguards. The only pertinent Illinois case cited to us is *Davenport v. Commissioners of Drainage District* (1887), 25 Ill. App. 92, which upheld the Drainage Code franchise limitation against a challenge brought under the 1870 Illinois Constitution. However, the *Davenport* court upheld the statute essentially without comment or analysis, and dismissed the constitutional issue as not applicable to elections of drainage district commissioners. Thus, *Davenport* gives us no guidance as to the question now before us. In the absence of prior suggestions that our Constitution is more stringent than the Federal Constitution on such matters, we decline to find that the voting scheme challenged here violates the equal protection provision of the Illinois Constitution.

█ In addition to their equal protection argument, plaintiffs assert that the Code is unconstitutionally vague in failing to adequately define a landowner. Defendant responds, and we agree, that plaintiffs

do not have standing to raise this issue. A plaintiff has standing where he has a real interest in the subject matter of the controversy and must allege a direct injury to his rights and not merely that he will suffer in some indefinite way. (*Chicago Park District v. City of Chicago* (1984), 127 Ill. App. 3d 215, 218, 468 N.E.2d 1261.) The doctrine of standing requires that plaintiff allege an injury to a legally protected interest, so that the court will be hearing only actual, specific controversies. (*Briarcliffe West Townhouse Owners Association v. Wiseman Construction Co.* (1983), 118 Ill. App. 3d 163, 168, 454 N.E.2d 363.) Here, the record does not reveal any actual injury to plaintiffs from uncertainty in the statute. Plaintiffs did not allege how any specific voter's or candidate's rights were adversely affected by the alleged vagueness of the term "landowner." They did not claim that any particular voter was prohibited from voting or that any particular person voted improperly because of a lack of clarity in the statute. Instead, plaintiffs made only the broadest of assertions that the Code is fatally vague because it fails to define the term landowner in a manner "wherein it can be applied fairly to all persons." Plaintiffs' complaint did not assert any direct injury to plaintiffs or any actual controversy arising from vagueness of the statutory term and is insufficient to give plaintiffs standing to raise the vagueness issue. *Chicago Park District v. City of Chicago* (1984), 127 Ill. App. 3d 215, 468 N.E.2d 1261.

■ Even if plaintiffs did have standing on the vagueness issue, however, we do not find the statute so lacking in clarity as to render it unconstitutional. The Code limits the vote to "every adult owner of land in the district." (Ill. Rev. Stat. 1983, ch. 42, par. 4—5.) The relevant definitions as set forth in section 1—2 of the Code are:

" 'Land' means real property and includes, but is not restricted to, lots, railroad rights-of-way, public highways, streets and alleys and easements.

'Landowner' or 'owner' means the owner of real property and includes an owner of an undivided interest, a life tenant, a remainderman and a trustee under an active trust but does not include a mortgagee, a trustee under a trust deed in the nature of a mortgage, a lien holder or a lessee.

'Adult landowner' or 'adult owner' includes public and private corporations." Ill. Rev. Stat. 1983, ch. 42, pars. 1—2(h), (i), (j).

A statute is not unconstitutionally vague if it is clear and definite and provides sufficient standards to guide the administrative body in the performance of its functions. (*Polyvend, Inc. v. Puckorius* (1979),

77 Ill. 2d 287, 299-300, 395 N.E.2d 1376.) A statute may be tested for vaguenes by determining whether terms are so vague as to require persons of common intelligence to guess at its meaning and dicker as to its application. 77 Ill. 2d 287, 299-300, 395 N.E.2d 1376.

The terms of the statute challenged here leave very little to guesswork. While the statute does not attempt to create an all-encompassing list of landowners, it does specify that voters must own land, and it defines land. It defines landowners by references to ownership of real property and lists a wide variety of kinds of ownership interests, some of them less than freehold interests. It also lists interests in land which do not qualify for voting privileges and makes specific provisions for corporate landowners. Persons of common intelligence would be highly unlikely to differ as to whether a prospective voter was or was not a landowner as defined in the Code. Plaintiffs are reaching by challenging the definition of landowner on vagueness grounds.

■ Plaintiffs next contend that a number of statutory violations which occurred during the election denied them due process and rendered the election void. They complain first that the commissioners themselves did not sit as judges of election even though section 4—5 of the Code states that the commissioners *shall* be the judges of election. Plaintiffs further complain that the judges (1) allowed Mitchell to remain in the polling place and electioneer during the election, (2) held the polling place open for only two hours thus preventing some voters from voting, and (3) unnecessarily required voters to sign an affidavit attesting to their residency and voter registration and, also unnecessarily, asked voters where they lived. Finally, plaintiffs claim that the defendants did not provide absentee ballots despite requests for such ballots. Plaintiffs assert that the irregularities, taken together, were sufficiently unfair to void the election. We find that the allegations of election irregularities are insufficient in either fact or law.

Plaintiffs argue that the Code required the commissioners themselves to sit as judges of election rather than appointing judges. This issue is raised for the first time on appeal. Plaintiffs claim they raised it below when they questioned Mitchell during his deposition about selecting the judges. But the questions to Mitchell pertained to who the judges were, where they came from and who appointed them. There is no discussion in the deposition regarding the statutory requirement that commissioners sit as election judges, nor is it pointed out anywhere else in the record. Thus, the issue was not adequately before the trial court, and plaintiffs are now barred from raising it in this court. *Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 147, 324 N.E.2d

417.

■ As for the various faults plaintiffs find with the judges: (1) Mitchell was acting as his own poll watcher and was properly allowed to remain in the polling place. Mitchell admitted that he had district materials with him, but the record is not adequate to show that he was electioneering. The significance of the data Mitchell brought with him to the polling place is not shown; nor is it clear how Mitchell used them. It was undoubtedly imprudent to take such materials into the polling place, but, in the absence of a showing that Mitchell was actually campaigning, their presence was not enough to void the election. (2) The Code only required that the polling place be kept open from 2 to 4 p.m. The judges had the authority to keep it open longer if necessary to accommodate voters. Here, however, Mitchell said there were no requests to extend the time. No claim is made that the voters were waiting in line to vote at the 4 p.m. closing time. Despite plaintiffs' allegations on appeal, the record is devoid of evidence of actual voters who could not or did not vote because of the short voting hours and is not sufficient to void the election. (3) Although plaintiffs complain of the affidavit requirements and the request for voters' residence, they do not indicate how these were unfair or how they adversely affected any voter. If the requirements were unnecessary, or even improper, they were harmless.

On the matter of absentee ballots, provision of such ballots is neither mandated nor prohibited by the Code. Moreover, there is no record of any specific requests for an absentee ballot actually having been made. The lack of absentee ballots does not affect this election.

In conclusion, while there may have been some improprieties in the challenged election, and while some things could have been done better, the defects, even when taken together, did not amount to a denial of due process and cannot be said to have voided the election.

Since we have decided that the voting provisions of the Illinois Drainage Code (Ill. Rev. Stat. 1983, ch. 42, par. 4—5) do not violate Federal or State principles of equal protection, either on their face or as applied to the election challenged here, and that the election did not deny plaintiffs due process, we need not consider plaintiffs' claims under 42 U.S.C.A. sec. 1983 (West 1981).

In accordance with the views expressed above, we affirm the judgment of the trial court of Lake County.

Affirmed.

NASH, P.J., and LINDBERG, J., concur.