[No. 78598-8. En Banc.]
Argued June 27, 2006. Decided July 26, 2007.

DANIEL MADISON ET AL., *Respondents*, v. THE STATE OF WASHINGTON ET AL., *Appellants*.

*Robert M. McKenna*, Attorney General, and *Jeffrey T. Even*, *Deputy Solicitor General*, for appellants.

*Peter A. Danelo* and *Leonard J. Feldman* (of *Heller Ehrman, LLP*); *Darin M. Sands*; and *Aaron H. Caplan* (of *American Civil Liberties Union of Washington State*) (*Neil T. Bradley*, of counsel), for respondents.

*William Gleeson* and *Jay S. Carlson* on behalf of African American/Jewish Coalition for Justice, Friends Committee on Washington State Public Policy, Justice Works!, Legacy of Equality, National Association of Social Workers, People of Color Against AIDS Network, Statewide Poverty Action Network, Washington Defender Association, Washington State Safe Communities Collaborative, Western Prison Project, and Western Washington Fellowship of Reconciliation, amici curiae.

*Shankar Narayan*, *Kirsten D. Levingston*, *Catherine Weiss*, and *Erika Wood* on behalf of Brennan Center for Justice at New York University School of Law, Hate Free Zone Washington, Latina/o Bar Association of Washington, Loren Miller Bar Association, South Asian Bar Association of Washington, The Defender Association's Racial Disparity Project, and The Sentencing Project, amici curiae.

*William J. Crittenden* and *Patrick D. Brown* on behalf of League of Women Voters of Seattle and League of Women Voters of Washington, amici curiae.

¶1 FAIRHURST, J. — Respondents/cross-appellants Daniel Madison, Beverly DuBois, and Dannielle Garner are convicted felons seeking reinstatement of their voting rights.

Respondents challenge the constitutionality of Washington's disenfranchisement scheme because it denies the right to vote to convicted felons who have not completed all of the terms of their sentences, including full payment of their legal financial obligations (LFOs).[1] Respondents argue that the scheme violates the privileges and immunities clause of the Washington Constitution and the equal protection clause of the Fourteenth Amendment to the United States Constitution because it denies them the right to vote based on wealth. Following cross-motions for summary judgment, the trial court concluded that the scheme is unconstitutional as to felons who, due to their financial statuses, are unable to pay their LFOs immediately. The State sought direct review and requests that this court reverse the trial court's order and enforce Washington's constitution and statutes as written. Respondents cross-appeal and ask this court to hold that all felons who have satisfied all the terms of their sentences except for full payment of their LFOs be allowed to vote, regardless of their financial statuses.

¶2 We hold that Washington's disenfranchisement scheme does not violate the privileges and immunities clause of the Washington Constitution or the equal protection clause of the United States Constitution. We also hold that respondents lack standing to bring their cross-appeal, and we deny respondents' request for attorney fees because they are not the prevailing party. We reverse the trial court.

## I. FACTUAL AND PROCEDURAL HISTORY

¶3 The facts are undisputed. Daniel Madison was convicted of third degree assault in King County Superior Court in 1996. His sentence included an order to pay $483.25 in restitution, $200.00 in victim assessment fees, and $100.00 in court costs, for a total of $783.25 in LFOs. Madison is disabled due to mental illness, and his Social

---

[1] LFOs include court costs, fees, and victim restitution. *See* RCW 9.94A.030(28).

Security payments constitute his only regular monthly income. A court order set his monthly payment at $15, which he regularly makes. The court waived the payment of interest. Although Madison has paid at least $530.00 toward his LFOs, he still owes approximately $245.25. Madison has satisfied all of the terms of his sentence, with the exception of full payment of his LFOs.

¶4 Beverly DuBois was convicted of manufacturing and delivering marijuana in Stevens County Superior Court in 2002. Her sentence included an order to pay $1,000 to the Stevens County Drug Enforcement Fund, a $500 victim assessment fee, and $110 in court costs, for a total of $1,610 in LFOs. DuBois sustained a permanent disability from a 2000 car accident and her Social Security payments, disability payments, and food stamps constitute her only monthly income. In compliance with the court's payment plan, she regularly makes $10 payments toward her LFOs. Although she has paid at least $190.00, DuBois now owes approximately $1,895.69 due to interest accrual. DuBois has satisfied all of the terms of her sentence, with the exception of full payment of her LFOs.

¶5 Dannielle Garner was convicted of forgery in Skagit County Superior Court in 2003. Her sentence included an order to pay a $500 victim assessment fee and $110 in court fees, for a total of $610 in LFOs. Garner is permanently disabled due to mental illness, and her Social Security payments constitute her only monthly income. Garner regularly makes $10 payments toward her LFOs in compliance with a court order. The court also noted that once Garner pays the principal in full, the court may waive interest. Although she has paid at least $250 toward her LFOs, she still owes approximately $360. Garner has satisfied all of the terms of her sentence, with the exception of full payment of her LFOs.[2]

---

[2] The original complaint named two additional plaintiffs, Sebrina Moore and Larence Bolden, but the parties later stipulated to the voluntary dismissal of those two plaintiffs.

¶6 Respondents filed a complaint for declaratory relief in King County Superior Court arguing that Washington's disenfranchisement scheme violates the equal protection clause of the United States Constitution and 42 U.S.C. § 1983, and the privileges and immunities clause and article I, section 19 of the Washington Constitution. Following cross-motions for summary judgment, the trial court held that Washington's disenfranchisement scheme "is invalid as to all felons who have satisfied the terms of their sentences except for paying legal financial obligations, and who, due to their financial status, are unable to pay their legal financial obligations immediately." Clerk's Papers (CP) at 433. The court granted respondents' summary judgment motion, denied the State's summary judgment motion, and ordered that Madison, DuBois, and Garner were "entitled to register to vote." CP at 434.

¶7 The commissioner granted direct review on an accelerated basis and denied the State's motion to stay the trial court's order pending appeal without prejudice. The State did not move for reconsideration or appeal the denial of the stay.

## II. ISSUES

¶8 A. Whether Washington's felon disenfranchisement scheme violates the privileges and immunities clause of the Washington Constitution.

¶9 B. Whether Washington's felon disenfranchisement scheme violates the equal protection clause of the United States Constitution.

¶10 C. On cross-appeal, whether the trial court erred by limiting its order to only individuals who could not pay their LFOs immediately.

¶11 D. Whether the respondents are entitled to attorney fees.

## III. ANALYSIS

### Challenged Provisions and Standard of Review

¶12 Article VI, section 3 of the Washington Constitution disqualifies from the franchise, or the right to vote, "[a]ll persons convicted of infamous crime unless restored to their civil rights." The Washington Legislature has defined " 'infamous crime' " as "a crime punishable by death in the state penitentiary or imprisonment in a state correctional facility," or in other words, any felony offense. RCW 29A.04.079. Once disenfranchised, felons may seek to restore their civil rights through a governor's pardon. RCW 9.96.010. Additionally, felons may also seek to restore their civil rights through the issuance of a certificate of discharge. RCW 9.94A.637. A court may issue a certificate of discharge only when the felon has completed "all requirements of the sentence, including any and all legal financial obligations." RCW 9.94A.637(1)(a). In order to register to vote, a felon must take an oath that states that he or she is "not presently denied [his or her] civil rights as a result of being convicted of a felony." RCW 29A.08.230.[3]

¶13 The trial court held that this disenfranchisement scheme, and in particular RCW 9.94A.637, violates article I, section 12 and article I, section 19 of the Washington Constitution[4] and the equal protection clause of the Fourteenth Amendment to the United States Constitution be-

---

[3] Although respondents maintain that the number of currently disenfranchised felons in Washington State who have satisfied all of the terms of their sentences except for full payment of their LFOs is unknown, they note that, in 2001, the Department of Corrections estimated that number at 46,500. Br. of Resp'ts/Cross-Appellants at 6-7.

[4] Article I, section 19 of the Washington Constitution provides that "[a]ll elections shall be free and equal, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." In their complaint, respondents listed a violation of article I, section 19 as a separate claim for relief. However, the State asserts that respondents "abandoned that claim by failing to provide any relevant analysis of that provision." Br. of Appellants at 3 n.3. As the State notes, respondents cited article I, section 19 in their summary judgment motion only in relation to their privileges and immunities claim, not as an

cause it discriminates on the basis of a felon's ability to pay his or her LFOs. We review summary judgment motions and issues of constitutional interpretation de novo. *Berrocal v. Fernandez*, 155 Wn.2d 585, 590, ¶ 5, 121 P.3d 82 (2005); *In re Parentage of C.A.M.A.*, 154 Wn.2d 52, 57, ¶ 9, 109 P.3d 405 (2005). In general, " '[a] statute is presumed to be constitutional, and the party challenging its constitutionality bears the burden of proving its unconstitutionality beyond a reasonable doubt.' " *State v. Hughes*, 154 Wn.2d 118, 132, ¶ 25, 110 P.3d 192 (2005) (quoting *State v. Thorne*, 129 Wn.2d 736, 769-70, 921 P.2d 514 (1996)), *overruled in part on other grounds by Washington v. Recuenco*, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006). Thus, the respondents bear the responsibility of proving that Washington's disenfranchisement scheme is unconstitutional beyond a reasonable doubt. When presented with arguments under both the Washington and federal constitutions, we review the state constitutional arguments first. *State v. Reece*, 110 Wn.2d 766, 770, 757 P.2d 947 (1988).

A. Washington's felon disenfranchisement scheme does not violate the privileges and immunities clause of the Washington Constitution

¶14 The State argues that respondents do not assert a valid claim under the privileges and immunities clause of the Washington Constitution. Article I, section 12 provides that "[n]o law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations." Respondents argue

independent basis for decision. In this court, respondents again cite article I, section 19 only in relation to their privileges and immunities argument.

Although the trial court cited article I, section 19 in its ruling, we decline to review that provision as an independent basis for invalidating Washington's disenfranchisement scheme. *See* CP at 446. Respondents have failed to argue in this court or in the court below how they are entitled to relief under article I, section 19. This court does not consider assignments of error unsupported by argument. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Thus, we do not consider article I, section 19 as a basis for invalidating Washington's disenfranchisement scheme separate from respondents' privileges and immunities clause arguments.

that this court must "conduct a separate and independent inquiry into the constitutionality of [Washington's disenfranchisement scheme] under Washington's Constitution." Br. of Resp'ts/Cross-Appellants (Br. of Resp'ts) at 32. To that end, respondents engage in an analysis of the factors laid out in *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986), to determine whether the privileges and immunities clause of the Washington Constitution is more protective of the right to vote than is the equal protection clause of the United States Constitution.

¶15 This court engages in a two step inquiry when considering a claim that a provision of the Washington Constitution provides additional protection than is provided under a provision of the United States Constitution.[5] First, we determine whether "a provision of the state constitution should be given an interpretation independent from that given to the corresponding federal constitutional provision." *State v. McKinney*, 148 Wn.2d 20, 26, 60 P.3d 46 (2002). This first analysis considers the six nonexclusive, neutral *Gunwall* factors: (1) the textual language of the state constitution, (2) differences in the texts of parallel provisions of the federal and state constitutions, (3) state constitutional and common law history, (4) preexisting state law, (5) structural differences between the federal and state constitutions, and (6) matters of particular state or local concern. *Gunwall*, 106 Wn.2d at 58.

¶16 If we determine that an independent analysis is warranted, we then analyze "whether the provision in question extends greater protections for the citizens of this state." *McKinney*, 148 Wn.2d at 26. This second analysis focuses on whether our state constitution provision is more

---

[5] It is well settled that a party raising a claim under a state constitutional provision must brief the *Gunwall* factors to the extent required by this court's jurisprudence. Where our precedent establishes that a separate and independent analysis of a state constitutional provision is warranted, further *Gunwall* analysis is unnecessary to establish that point. However, parties may consider and brief the *Gunwall* factors as interpretive devices in support of our constitutional interpretation inquiry. *See* Hugh D. Spitzer, *New Life for the "Criteria Tests" in State Constitutional Jurisprudence: "Gunwall is Dead—Long Live Gunwall!,"* 37 RUTGERS L.J. 1169 (2006).

protective of the claimed right in the particular context than is the federal constitution provision, and the scope of that protection. Such an "analysis involves, among other things, an examination of the language of the provision, its relationship to other constitutional provisions, the existing and preceding statutory and common law at the time it was adopted, and other historical context." Concurrence (Madsen, J.) at 112. The six *Gunwall* factors parallel interpretive inquiries made when determining "whether the state constitution ultimately provides greater protection than its corresponding federal provision." *Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 115, 937 P.2d 154, 943 P.2d 1358 (1997) (citing *State v. Boland*, 115 Wn.2d 571, 575, 800 P.2d 1112 (1990)).

¶17 This court previously determined that the privileges and immunities clause of the Washington Constitution "requires an independent constitutional analysis from the equal protection clause of the United States Constitution." *Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 150 Wn.2d 791, 811, 83 P.3d 419 (2004) (*Grant County* II).[6] Once this court has established that a state constitutional provision warrants an analysis independent of a particular federal provision, it is unnecessary to engage repeatedly in further *Gunwall* analysis simply to rejustify performing that separate and independent constitutional analysis. *State v. White*, 135 Wn.2d 761, 769, 958 P.2d 982

---

[6] Justice Madsen asserts that "an independent analysis applies under article I, section 12 *only* where the challenged legislation grants a privilege or immunity to a minority class, that is, in the case of a grant of positive favoritism." Concurrence (Madsen, J.) at 111 (emphasis added). However, *Grant County* II did not impose this limitation on its determination that article I, section 12 warrants an independent analysis from the equal protection clause of the United States Constitution. *See Grant County* II, 150 Wn.2d at 805 ("[W]e hold that the privileges and immunities clause of the Washington State Constitution, article I, section 12, requires an independent constitutional analysis from the equal protection clause of the United States Constitution."); *id.* at 806 ("In determining that our state constitutional provision requires a separate and independent constitutional analysis from the United States Constitution, we consider [the *Gunwall*] criteria."); *id.* at 811 ("For the reasons dictated by the preceding *Gunwall* analysis, we hold that article I, section 12 of the Washington State Constitution requires an independent constitutional analysis from the equal protection clause of the United States Constitution.").

(1998). Thus, *Grant County* II's determination satisfies the first step of our inquiry.

¶18 In considering the respondents' privileges and immunities claim, we must initially address whether the right to vote is a privilege or immunity that is protected by article I, section 12 of the Washington Constitution. "For a violation of article I, section 12 to occur, the law, or its application, must confer a privilege to a class of citizens." *Grant County* II, 150 Wn.2d at 812. Although the precise confines of what constitutes a privilege remains unclear, this court has stated that for the purposes of article I, section 12, privileges are " 'those fundamental rights which belong to the citizens of the state by reason of [their state] citizenship.' " *Id.* at 813 (quoting *State v. Vance*, 29 Wash. 435, 458, 70 P. 34 (1902)). This court has previously recognized that the right to vote is a fundamental right afforded to the citizens of Washington State.[7] *See, e.g., Foster v. Sunnyside Valley Irrigation Dist.*, 102 Wn.2d 395, 404, 687 P.2d 841 (1984). Article I, section 19 of the Washington Constitution prohibits interference with "the free exercise of the right of suffrage." Therefore, we conclude that the right to vote is a privilege of state citizenship, implicating the privileges and immunities clause of the Washington Constitution.

¶19 Having determined that the privileges and immunities clause warrants an independent state constitutional analysis and that the right to vote is a privilege implicating the clause, we now focus on the second step of our inquiry: whether and to what extent the clause provides greater protection in the context of felon voting. As previously mentioned, the *Gunwall* factors parallel inquiries made

---

[7] Justice J.M. Johnson's concurrence would have this court limit the right to vote, for purposes of the privileges and immunities clause, to " *'the elective franchise, as regulated and established by the laws or constitution of the state.'* " Concurrence (J.M. Johnson, J.) at 119-20 (quoting *Corfield v. Coryell*, 6 F. Cas. 546, 552 (E.D. Pa. 1823) (No. 3230). Justice J.M. Johnson's approach would seem to insulate statutory voting restrictions from any review under the privileges and immunities clause because every such restriction would, by definition, be encompassed within the "elective franchise as regulated." We reject this narrow construction of the fundamental right to vote.

when interpreting a state constitutional provision to determine the extent of the protection it provides in a particular context. *Boland,* 115 Wn.2d at 575. Here an analysis of preexisting state law (*Gunwall* factor four) is especially useful.

¶20 With respect to preexisting state law, respondents argue that article I, section 19, which confers the right to "free and equal" elections, indicates that the Washington Constitution provides greater protection of the right to vote under the privileges and immunities clause than does the federal constitution. Respondents also cite the provisions of article VI, sections 4-7, which provide for residency contingencies, prevent arrest during attendance at elections, and require secret ballots and voter registration laws, as proof of the requirement of "affirmative state action to protect the right to vote against state interference." Br. of Resp'ts at 37. This court has recognized that the Washington Constitution goes further to safeguard the right to vote than does the federal constitution. *See, e.g., Foster,* 102 Wn.2d at 404 ("Because we find that the Washington Constitution goes further to safeguard this right than does the federal constitution, we base our decision here upon the Washington Constitution.").

¶21 However, this court has recognized that increased protection only in relation to individuals who currently possess the fundamental right to vote, not felons whose voting rights have been stripped. While article I, section 19 explicitly grants the right to "free and equal" elections, article VI, section 3 explicitly mandates the disenfranchisement of felons. Reading the mandate to disenfranchise felons in article VI, section 3 in conjunction with article I, section 12, we conclude that article I, section 12 of the Washington Constitution does not provide greater protection of voting rights for felons than does the equal protection clause of the federal constitution.

¶22 Finally, the respondents fail to assert a privileges and immunities clause violation because Washington's disenfranchisement scheme does not involve a grant of favor-

itism. In *Grant County* II, we explained that the text of the federal constitution "is concerned with majoritarian threats of invidious discrimination against nonmajorities," while the state constitution "protects as well against laws serving the interest of special classes of citizens to the detriment of the interests of all citizens." 150 Wn.2d at 806-07. Respondents argue that Washington's disenfranchisement scheme confers the privilege of vote restoration only on a minority of felons with financial resources and that Washington's privileges and immunities clause protects against such favoritism toward the wealthy.

¶23 The privileges and immunities clause does reflect, in part, our framers' concerns with "undue political influence exercised by those with large concentrations of wealth" and "avoiding favoritism toward the wealthy." *Grant County* II, 150 Wn.2d at 808. However, such concerns are not triggered by Washington's felon disenfranchisement scheme because it grants the "privilege[ ]" of restoration of voting rights "upon the same terms . . . equally . . . to all citizens." CONST. art. I, § 12. The Washington Constitution grants the right to vote to all Washington citizens on equal terms. Additionally, the Washington Constitution disqualifies voters on equal terms—that is, when individuals have been convicted of committing a felony. Finally, Washington's statutory disenfranchisement scheme provides for the restoration of voting rights to felons on equal terms—that is, only after individuals have satisfied all of the terms of their sentences. If those terms include payment of LFOs, then the full payment of LFOs is one of the prerequisites to restoration of voting rights. The system of only restoring voting rights to felons who have satisfied all of the terms of their sentences, including fully paying their LFOs, does not constitute a grant of favoritism or a granting of a privilege on unequal terms, in violation of article I, section 12, because the same standard is applied evenly to all felons seeking restoration of their voting rights.

¶24 Therefore, we hold that the Washington Constitution is not more protective of the right to vote in this

context, and that the respondents have failed to assert an article I, section 12 violation. The restoration of voting rights to felons who have fully paid their LFOs does not constitute a grant of favoritism in violation of the privileges and immunities clause of the Washington Constitution. Thus, we consider respondents' claims under the equal protection clause of the United States Constitution.

B. Washington's felon disenfranchisement scheme does not violate the equal protection clause of the United States Constitution

¶25 The trial court held that Washington's disenfranchisement scheme violated the equal protection clause of the Fourteenth Amendment to the United States Constitution and the privileges and immunities clause of the Washington Constitution because it unconstitutionally discriminates on the basis of wealth. The court concluded that the State failed to prove "a rational relationship between a felon's ability to immediately pay LFOs and a denial of the right to vote." CP at 445. In this court, respondents renew their argument that Washington's felon disenfranchisement scheme is subject to strict scrutiny because it denies individuals the fundamental right to vote. Thus, we must first consider whether felons possess a constitutionally protected right to vote, the denial of which is subject to strict scrutiny.

1. Felons do not possess a constitutionally protected right to vote

¶26 As the trial court noted, "[r]emarkably little is said in the Federal Constitution regarding the right to vote" and "[i]t is mentioned almost in passing in Article I, Sections 2 and 4." CP at 438. However, the United States Supreme Court has repeatedly recognized that the right to vote is fundamental for all citizens. *See, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 561-62, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964). Moreover, article I, section 19 of the Washington Constitution declares that "no power, civil or military, shall at any

time interfere to prevent the free exercise of the right of suffrage." Thus, because the right to vote has been recognized as fundamental for all citizens, restrictions on that right generally are subject to strict scrutiny, meaning they must be narrowly tailored to further a compelling state interest. *Id.* at 562; *City of Seattle v. State*, 103 Wn.2d 663, 670, 694 P.2d 641 (1985).

¶27 However, the State disputes that felons have a constitutionally protected right to vote. Although respondents' equal protection claim is based on section 1 of the Fourteenth Amendment to the United States Constitution,[8] section 2 of the Fourteenth Amendment provides that "when the right to vote at any election . . . is denied to any of the male inhabitants of such state . . . or in any way abridges, *except for participation in rebellion, or other crime,* the basis of representation therein shall be reduced." (Emphasis added.) The State asserts that section 2 of the Fourteenth Amendment explicitly condones the disenfranchisement of criminals and, as a result, that any restriction on felons' right to vote does not violate the Fourteenth Amendment.

¶28 The State asserts that the United States Supreme Court reached the conclusion that felons do not possess a constitutionally protected right to vote in *Richardson v. Ramirez*, 418 U.S. 24, 94 S. Ct. 2655, 41 L. Ed. 2d 551 (1974), based on section 2 of the Fourteenth Amendment. In *Richardson*, three felons challenged the constitutionality of California's felon disenfranchisement scheme, which provided that felons' voting rights could be restored "by court order after the completion of probation, or, if a prison term was served, by executive pardon after completion of rehabilitation proceedings." *Id.* at 30 (footnote omitted). In response to the felons' arguments that the State must show

---

[8] "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

a "compelling state interest" to justify denial of the right to vote to felons, the Court cited the provisions of section 2 of the Fourteenth Amendment.

> We hold that the understanding of those who adopted the Fourteenth Amendment, as reflected in the express language of § 2 and in the historical and judicial interpretation of the Amendment's applicability to state laws disenfranchising felons, is of controlling significance in distinguishing such laws from those other state limitations on the franchise which have been held invalid under the Equal Protection Clause by this Court. . . . [W]e may rest on the demonstrably sound proposition that § 1, in dealing with voting rights as it does, could not have been meant to bar outright a form of disenfranchisement which was expressly exempted from the less drastic sanction of reduced representation which § 2 imposed for other forms of disenfranchisement.

*Id.* at 54-55. Thus, the Court rejected the felons' argument that the State must demonstrate a compelling interest in order to disenfranchise felons and held that felons' right to vote is not constitutionally protected.

¶29 Amicus curiae League of Women Voters of Washington asserts that *Richardson* does not stand for the proposition that the right to vote is not fundamental for felons. However, *Richardson* clearly distinguished the right that is at stake for felons from the Court's previous holdings that citizens possess a fundamental right to vote. "As we have seen, however, the exclusion of felons from the vote has an affirmative sanction in § 2 of the Fourteenth Amendment, a sanction which was not present in the case of the other restrictions on the franchise which were invalidated in the cases on which respondents rely." *Id.* at 54.

¶30 Furthermore, other courts have read *Richardson* as holding that felon disenfranchisement schemes are not subject to strict scrutiny because felons' right to vote is not constitutionally protected. For example, in *Williams v. Taylor*, 677 F.2d 510, 514 (5th Cir. 1982), which challenged Mississippi's disenfranchisement scheme as violating a

felon's due process rights, the United States Court of Appeals for the Fifth Circuit noted that a felon's "interest in retaining his right to vote is constitutionally distinguishable from the 'right to vote' claims of individuals who are not felons." As a result, the *Williams* court concluded that the disenfranchisement statute need withstand only rational basis review and noted that the Supreme Court had upheld a "fundamentally identical" system in *Richardson*. *Id.* Similarly, in *Owens v. Barnes*, 711 F.2d 25, 27 (3d Cir. 1983), the United States Court of Appeals for the Third Circuit concluded that "[i]t follows [from *Richardson*] that the standard of equal protection scrutiny to be applied when the state makes classifications relating to disenfranchisement of felons is the traditional rational basis standard." Thus, we conclude that *Richardson* dictates that we hold that the right to vote is not fundamental for convicted felons.[9]

¶31 Without reconciling *Richardson*, the dissent insists that voting remains a fundamental right of which felons cannot be deprived for failure to pay their financial obligations. Dissent at 124-25. However, the dissent's reasoning is unsound because it relies on an overstatement of the precedent governing the right of freedom and indigent felons' imposed financial obligations and an unpersuasive analogy between the rights of freedom and voting.

¶32 The dissent cites *Williams v. Illinois* and *Bearden v. Georgia* for the proposition that "once all of the assigned punishment has been imposed, except for the payment of financial obligations, failure to pay those financial obligations cannot be used to continue depriving felons of their freedom." Dissent at 124-25 (citing *Williams v. Illinois*, 399

---

[9] Respondents repeatedly refer to themselves as "ex-felons." *See, e.g.*, Br. of Resp'ts at 2 ("Plaintiffs Daniel Madison, Beverly DuBois, and Dannielle Garner are *ex-felons* who have completed all terms of their sentences, with the exception of the full payment of [LFOs]." (emphasis added)). The term "ex-felon" is inaccurate. Once convicted, an individual who has committed a felony remains a "felon," even after the individual receives a certificate of discharge. *See* RCW 9.94A.637(2) ("The department shall create and maintain a data base containing the names of all *felons who have been issued certificates of discharge*, the date of discharge, and the date of conviction and offense." (emphasis added)).

U.S. 235, 241-42, 90 S. Ct. 2018, 26 L. Ed. 2d 586 (1970); *Bearden v. Georgia*, 461 U.S. 660, 672-73, 103 S. Ct. 2064, 76 L. Ed. 2d 221 (1983)). However, contrary to the dissent's assertion, *Williams* and *Bearden* do not stand for such a broad principle. The *Williams* Court held "only that a State may not constitutionally imprison *beyond the maximum duration fixed by statute* a defendant who is financially unable to pay a fine." 399 U.S. at 243 (emphasis added). The *Bearden* Court merely held it unconstitutional to revoke *automatically* an indigent defendant's probation for failure to pay a fine, *without evaluating* whether the defendant had made bona fide efforts or what alternative punishments might exist. 461 U.S. at 672-73. Neither case supports the dissent's blanket assertion that "failure to pay . . . financial obligations cannot be used to continue depriving felons of their freedom." Dissent at 124-25.

¶33 The dissent relies on its overstatement of *Williams* and *Bearden* to reason as follows: (1) freedom is a fundamental right that can be taken away as punishment for a felony, (2) felons cannot continue to be deprived of their freedom for failure to pay a fine, (3) therefore freedom remains a fundamental right. *Id.* The dissent then claims that what is true of freedom is likewise true of voting because voting is also a fundamental right that can be taken away as punishment for a felony. *Id.* at 125.

¶34 The analogy the dissent draws between the two rights is flawed. We agree that both the right to vote and the right to be free from incarceration are protected by the equal protection clause of section 1 of the Fourteenth Amendment. However, the dissent fails to grapple with the impact of section 2 of the Fourteenth Amendment upon the right to vote *for felons*. Section 2 contains no parallel language restricting felons' right to be free from incarceration. Thus the dissent's analogy is of limited value. The dissent's conclusion that, like freedom from incarceration, voting "remains a fundamental right, and when all other conditions of a sentence have been fulfilled, felons cannot be deprived further of their right to vote for failure to pay LFOs" is unsupported. *Id.*

2. Washington's disenfranchisement scheme is rationally related to legitimate state interests

¶35 Because no fundamental right is at stake in this case and respondents do not allege that they constitute a suspect class, we do not apply strict scrutiny in analyzing Washington's disenfranchisement scheme. We next consider whether to apply intermediate scrutiny or rational basis review. Intermediate scrutiny is not appropriate in this case because this court has held that "intermediate scrutiny will be applied only if the statute implicates both an important right and a semi-suspect class not accountable for its status." *In re Pers. Restraint of Runyan*, 121 Wn.2d 432, 448, 853 P.2d 424 (1993). Respondents have failed to establish that felons' right to vote qualifies as an important right under federal case law. Additionally, even though low-income felons may not be accountable for their wealth status, they have been adjudicated responsible for their status as felons, which is the classification at issue. Therefore, we do not apply intermediate scrutiny, and we examine Washington's disenfranchisement scheme using rational basis review. Under rational basis review, this court must uphold a law establishing classifications unless the " 'classification rests on grounds wholly irrelevant to the achievement of legitimate state objectives.' " *Habitat Watch v. Skagit County*, 155 Wn.2d 397, 414, ¶ 35, 120 P.3d 56 (2005) (quoting *State v. Harner*, 153 Wn.2d 228, 235-36, ¶ 12, 103 P.3d 738 (2004)).

¶36 In considering respondents' equal protection claim, we must determine what classification Washington's disenfranchisement scheme establishes. The State asserts that the scheme does not establish a wealth-based classification because "[t]he only classification drawn by Washington law is between those who have completed all of the terms of their sentences and those who have not." Br. of Appellants at 19. Although it is clear that the requirement that felons pay their LFOs in full may impact felons disparately based on their differing income statuses, this alone does not

104

establish an equal protection violation. " '[T]he equal protection clause does not require a state to eliminate all inequalities between the rich and the poor.' " *Runyan*, 121 Wn.2d at 449 (quoting *Riggins v. Rhay*, 75 Wn.2d 271, 283, 450 P.2d 806 (1969)).

¶37 In *Runyan*, prisoners challenged the constitutionality of a time-bar statute, arguing that the statute violated "the equal protection rights of indigent prisoners because they are unable to acquire legal representation quickly enough to collaterally attack their convictions." *Id.* at 448. We upheld the statute because it made "no distinction among rich or poor prisoners and applie[d] equally to both." *Id.* at 449. Similarly, in this case, Washington's disenfranchisement scheme does not distinguish between rich or poor felons but instead requires all felons to complete all of the terms of their sentences before they may seek reinstatement of their civil rights. Thus, we conclude that Washington's disenfranchisement scheme does not classify based on wealth.[10]

¶38 Respondents assert that even if Washington's disenfranchisement scheme may appear facially neutral, the scheme discriminates in operation. Respondents cite *Williams*, 399 U.S. at 242 (quoting *Griffin v. Illinois*, 351 U.S. 12, 17 n.11, 76 S. Ct. 585, 100 L. Ed. 891 (1956)), in which the Court noted that " 'a law nondiscriminatory on its face may be grossly discriminatory in its operation.' " In *Williams*, the Court held that an Illinois statute that allowed for the continued incarceration of prisoners beyond the statutory maximum sentence because the prisoners had

[10] Amici curiae Brennan Center for Justice at New York University School of Law et al. (BCJ) argue that Washington's felon disenfranchisement scheme was motivated by racism and disproportionately burdens racial minorities. Br. of Amici Curiae BCJ at 9-17. As the State notes, respondents have never argued that Washington's disenfranchisement classifies on the basis of race. Appellant's/Cross Resp'ts Reply Br. to Brs. of Amici Curiae at 14. This court does not consider issues raised first and only by amici. *Citizens for Responsible Wildlife Mgmt. v. State*, 149 Wn.2d 622, 631, 71 P.3d 644 (2003) (citing *Sundquist Homes, Inc. v. Snohomish County Pub. Util. Dist. No. 1*, 140 Wn.2d 403, 413, 997 P.2d 915 (2000)). Thus, we will not consider whether the statutes at issue here discriminate on the basis of race.

failed to pay their fines violated the equal protection rights of those indigent prisoners. 399 U.S. at 241. However, as the State notes, *Williams* is distinguishable from this case because it involved an individual's fundamental right to be free from involuntary confinement, whereas this case concerns the right of felons to vote, which is not constitutionally protected.

¶39 In another case cited by respondents, *Bearden*, 461 U.S. at 672-73, the Court held that the state violated the fundamental fairness required by the Fourteenth Amendment by revoking probation for failure to pay fines without inquiring into the reasons for the failure to pay. *Bearden*, like *Williams*, also involves a deprivation of "conditional freedom" and has the effect of turning "a fine into a prison sentence." *Id.* at 672, 674. Additionally, both *Williams* and *Bearden* involve *additional punishments* imposed on individuals for failure to pay their fines. Here, no additional punishment is imposed—all felons simply cannot seek restoration of their civil rights until they have completed all of the terms of their sentences.

¶40 Respondents also argue that the requirement that felons complete all the terms of their sentences, including full payment of their LFOs, constitutes an unconstitutional poll tax. Respondents rely largely on *Harper v. Virginia Board of Elections*, 383 U.S. 663, 670, 86 S. Ct. 1079, 16 L. Ed. 2d 169 (1966), in which the United States Supreme Court invalidated a Virginia poll tax because it violated the equal protection clause. However, the poll tax in *Harper* applied to all Virginia citizens, individuals who possessed a fundamental right to vote under the United States Constitution. Convicted felons, on the other hand, no longer possess that fundamental right as a direct result of their decisions to commit a felony. Additionally, while *Harper* holds that wealth is "not germane to one's ability to participate intelligently in the electoral process," that is not the inquiry in this case. *Id.* at 668. The correct inquiry is whether a felon's completion of the terms of his or her sentence is germane to one's participation in the electoral

process. Thus, *Harper* is distinguishable on the basis that it involved a fundamental right, whereas this case does not. As a result, we need consider only whether there is a rational relationship between requiring felons to satisfy all of the terms of their sentences, including full payment of their LFOs, and any legitimate governmental interests, such as punishment, before a felon may receive reinstatement of his or her voting rights.[11]

¶41 The parties also dispute how the issue in this case should be framed and whether the correct inquiry is if Washington's *disenfranchisement* scheme is constitutional or if Washington's scheme to *restore* voting rights to felons is constitutional. The respondents argue that although the State has the right to disenfranchise felons, it may not condition the restoration of their voting rights on the payment of LFOs.[12] The State, on the other hand, argues that the respondents' reframing of the issue creates a "fiction" because "[t]he so-called conditions for reinstatement that Respondents claim to challenge are nothing more than a description of the period of disenfranchisement—a description of its duration." Br. of Appellants at 10. As the State argues, the provisions in the state and federal constitutions allowing for disenfranchisement of felons do not state a time limit. In fact, a state may permanently disenfranchise a felon without violating his or her constitutional rights.

¶42 Moreover, it is not Washington's *re-enfranchisement* statute that denies felons the right to vote but rather the continuing applicability of its *disenfranchisement* scheme. The United States Court of Appeals for the Ninth Circuit noted in *Farrakhan v. Washington*, 338 F.3d 1009, 1022 (9th

---

[11] Confusingly, the dissent seems to rely on *Shepherd v. Trevino*, 575 F.2d 1110, 1114 (5th Cir. 1978), to support the contention that *Harper* does apply to felons' right to vote. Dissent at 126. However, the dissent's quote from the *Shepherd* court simply asserts, as we do here, that rational basis is the appropriate standard of review for such classifications. *Id.*

[12] The dissent agrees with respondents that this case is "about felon re-enfranchisement," not "felon disenfranchisement." Dissent at 124. However, the dissent does not expand upon why it finds reframing the issue to be dispositive.

Cir. 2003), when considering the constitutionality of Washington's felon disenfranchisement scheme under section 2 of the Voting Rights Act Amendments of 1982, 42 U.S.C. § 1973, that the felon plaintiffs in that case had "not been denied the right to vote because of the restoration process, but rather due to the disenfranchisement provision . . . and because they ha[d] not satisfied all the requirements of their sentences to become statutorily eligible for discharge of their convictions." Additionally, we conclude that the requirement that felons pay their LFOs should not be divorced from the context in which that requirement arose, which was as a result of the individual's commission of a felony. Thus, the requirement that felons must pay their LFOs is not merely a condition for reinstatement of voting rights, it is a requirement that felons must satisfy to complete the terms of their sentences.

¶43 Even if the correct inquiry in this case were whether Washington's re-enfranchisement scheme passes constitutional muster, we would hold that it does. *Richardson* involved three individual felons who had completed their sentences and paroles. 418 U.S. at 26. The Court noted that when it had previously considered exclusions of "some or all" felons from the franchise, it had "indicated approval of such exclusions on a number of occasions." *Id.* at 53. Additionally, as the United States Court of Appeals for the Fifth Circuit observed about the *Richardson* decision, "although the analysis engaged in by the Court focuses on a state's power to disenfranchise persons convicted of a felony generally, the specific holding of the Court was that a state may deny the franchise to that group of 'convicted felons who have completed their sentences and paroles.'" *Shepherd v. Trevino*, 575 F.2d 1110, 1114 (5th Cir. 1978) (quoting *Richardson*, 418 U.S. at 56). The *Shepherd* court, in upholding the constitutionality of a Texas re-enfranchisement scheme, concluded that "the [*Richardson*] Court clearly envisioned that a state could grant the right to vote to some persons convicted of a felony while denying it to others." *Id.* Thus, we conclude that Washington's re-enfranchisement

statute is constitutional so long as the classification drawn is rationally related to a legitimate state interest.

¶44 Respondents also argue that the State's asserted interests in requiring felons to pay their LFOs before having their voting rights restored are not legitimate state interests that provide a rational basis for Washington's disenfranchisement scheme. Respondents challenge the State's asserted interests in limiting political participation of those unwilling to abide by laws and in requiring the completion of all sentence elements before the right to vote is restored.[13] Respondents argue that a felon's ability to pay his or her LFOs immediately does not indicate whether he or she is law-abiding. Additionally, respondents argue that the State may not "justify otherwise unconstitutional laws simply by asserting its interest in having its laws followed" and that such an argument is circular. Br. of Resp'ts at 21.

¶45 However, in *Green v. Board of Elections*, 380 F.2d 445, 451 (2d Cir. 1967), the United States Court of Appeals for the Second Circuit recognized the legitimate interest in denying the right to vote to those who have committed felonies. "[I]t can scarcely be deemed unreasonable for a state to decide that perpetrators of serious crimes shall not take part in electing the legislators who make the laws, the executives who enforce these, the prosecutors who must try them for further violations, or the judges who are to consider their cases." *Id.* Respondents' argument that the State's asserted interest in having its laws followed is circular is not persuasive. The State clearly has an interest in ensuring that felons complete all of the terms of their sentence, and there is no requirement that the State restore voting rights to felons until they do so.

¶46 As a result, respondents fail to establish that the requirement that felons complete all of the terms of their sentence, including full payment of any LFOs, is "wholly irrelevant" to any "legitimate state objective." Therefore, we

---

[13] As respondents note, the State appears to have abandoned on appeal its third stated interest in the "important public functions" served by LFOs. Br. of Resp'ts at 16.

hold that Washington's disenfranchisement scheme does not violate the equal protection clause of the Fourteenth Amendment to the United States Constitution because it is rationally related to legitimate state interests. We reverse the trial court and uphold Washington's statutes and constitution as written.[14]

C. The respondents lack standing to bring their cross-appeal

¶47 On cross-appeal, respondents challenge the limitation of the trial court's order invalidating Washington's disenfranchisement scheme only for "felons who have satisfied the terms of their sentences except for paying legal financial obligations, and who, due to their financial status, are unable to pay their legal financial obligations immediately." CP at 433. Respondents assert that all felons who have satisfied the terms of their sentences, except for full payment of their LFOs, should be allowed to vote, regardless of their financial statuses. We note initially that respondents likely lack standing to bring this cross-appeal because they are not an aggrieved party under RAP 3.1, which states that "[o]nly an aggrieved party may seek review by the appellate court." All of the respondents were covered by the trial court's order holding that the respondents were entitled to register to vote. Thus, the respondents were prevailing parties, not aggrieved parties.

¶48 Respondents also argue that, as the United States argued in its amicus brief in *Harper*, merely prohibiting a

---

[14] Many of the respondents' arguments in opposition to Washington's felon disenfranchisement scheme relate to the process of seeking re-enfranchisement and the burden the requirement to pay LFOs places on low-income felons. These arguments are not pertinent to an equal protection claim. While we uphold the disenfranchisement scheme, we emphasize that we are not making a judgment about whether the requirement that felons complete payment of their LFOs before receiving restoration of their civil rights makes sense from a policy perspective. When the Supreme Court considered the argument in *Richardson* that denying felons the right to vote was "outmoded" and did not aid in rehabilitating felons, the Court noted that it "would by no means discount these arguments if addressed to the legislative forum which may properly weigh and balance them against those advanced in support of California's present constitutional provisions. But it is not for us to choose one set of values over the other." 418 U.S. at 55.

poll tax in relation to indigents would create an ongoing hardship because " 'it would be necessary to require evidence of poverty, and the furnishing of such evidence would itself constitute a burden on the exercise of the franchise.' " Reply Br. of Resp'ts/Cross-Appellants at 11 (quoting Br. for the United States as Amicus Curiae, *Harper v. Va. State Bd. of Elections*, No. 48, 1965 WL 130114, *33 (U.S. Sept. 10, 1965)). However, the court in *Harper* did not explicitly adopt that reasoning. Moreover, the respondents cannot argue that they are so burdened because the trial court already ordered that they be allowed to register to vote without any further qualification. Thus, respondents have failed to prove that they are aggrieved parties for the purpose of bringing a cross appeal.

¶49 Furthermore, even if we assume that the respondents have standing, we hold that respondents' cross-appeal lacks merit. Because we have determined that Washington's disenfranchisement scheme does not violate the constitutional rights of felons who are unable to pay their LFOs, we must necessarily hold that the scheme does not violate the constitutional rights of those who are able to pay their LFOs.

## D. The respondents are not entitled to attorney fees

¶50 Respondents claim that they are entitled to attorney fees under 42 U.S.C. § 1983 and 42 U.S.C. § 1988. However, because we reverse the trial court and enforce Washington's disenfranchisement scheme as written, the respondents are not a prevailing party entitled to attorney fees.

## IV. CONCLUSION

¶51 We hold that Washington's disenfranchisement scheme does not violate the privileges and immunities clause of the Washington Constitution or the equal protection clause of the United States Constitution. It is the province of the legislature to determine the best policy approach for re-enfranchising Washington's felons. We also

hold that respondents lack standing to bring their cross-appeal and that they are not entitled to attorney fees. We reverse the trial court.

BRIDGE and OWENS, JJ., concur.

¶52 MADSEN, J. (concurring) — I write separately because the majority unfortunately fails to follow the court's holding in *Grant County Fire Protection District No. 5 v. City of Moses Lake*, 150 Wn.2d 791, 83 P.3d 419 (2004), that an independent analysis applies under article I, section 12 only where the challenged legislation grants a privilege or immunity to a minority class, that is, in the case of a grant of positive favoritism. This is because, as we concluded in *Grant County*, the language and history of the provision show that the concern underlying the state privileges and immunities clause, unlike that of the equal protection clause, is undue favoritism, not discrimination, and the concern about favoritism arises where a privilege or immunity is granted to a minority class. *Id.* at 806-10. Therefore, unless the challenged law is a grant of positive favoritism to a minority class, an independent state constitutional analysis is not appropriate.

¶53 The majority misreads *Grant County*, however, to say that an independent state constitutional analysis is always appropriate under article I, section 12. *Grant County* is quite clear that this was not the court's intent: "[T]he historical context as well as the linguistic differences indicate that the Washington State provision requires independent analysis from the federal provision when the issue concerns favoritism." *Id.* at 809. *Grant County* does not justify the majority's conclusion that an independent state constitutional analysis is always appropriate under article I, section 12.

¶54 Here, no grant of positive favoritism to a minority class is at issue. Instead, the question is whether those felons who have been unable to discharge legal financial obligations that are part of their sentences are discriminated against by a law that bars them from voting until

they fully satisfy all the terms of their sentences, including financial obligations. The court should apply the same constitutional analysis that applies under the equal protection clause of the United States Constitution because no grant of positive favoritism is involved.

¶55 I agree with the majority that under the equal protection clause, there is no impermissible discrimination in declining to restore voting rights unless and until a felon completes the terms of his or her sentence, including any legal financial obligations. *See Richardson v. Ramirez*, 418 U.S. 24, 94 S. Ct. 2655, 41 L. Ed. 2d 551 (1974); *Farrakhan v. Washington*, 338 F.3d 1009, 1022-23 (9th Cir. 2003); *Green v. Bd. of Elections*, 380 F.2d 445, 451-52 (2d Cir. 1967). Accordingly, there is neither a violation of the equal protection clause, nor, applying the same analysis, a violation of article I, section 12.

¶56 I am also concerned about the majority's conclusion that the *Gunwall*[15] factors "parallel inquiries made when interpreting a state constitutional provision to determine the extent of the protection it provides in a particular context." Majority at 95-96. Any constitutional analysis involves, among other things, an examination of the language of the provision, its relationship to other constitutional provisions, the existing and preceding statutory and common law at the time it was adopted, and other historical context. Constitutional interpretation is an examination of matters that illuminate the meaning of the provision at issue.

¶57 But care should be taken, and litigants should not simply repeat the same *Gunwall* analysis as is applied when first deciding whether a state provision with a similar federal counterpart should be independently applied. In *Gunwall* itself, the court did not engage in the same inquiry in order to decide how to apply the constitutional provision

---

[15] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).

at issue once the determination was made that an independent analysis was appropriate.[16]

¶58 I also disagree with the dissent's unwarranted emphasis on wealth.[17] The State does not, contrary to the dissent's view, create inequities between the rich and the poor by tying voting to the ability to pay. The plaintiffs were convicted of felony crimes and for this reason were disenfranchised; this is why they cannot vote. Regardless of whether they are rich or poor, they will continue to be disenfranchised until they complete their sentences, including their legal financial obligations. They have no constitutionally protected right to vote. The legislature can change the requirements for reinstating a felon's right to vote if it concludes that requiring felons to pay all financial obligations before regaining the vote is too harsh a condition to place on such a precious attribute of citizenship, but it is not constitutionally required to do so.

¶59 Finally, Justice Chambers' concurrence in the dissent is also flawed. This court's analysis of the privileges and immunities clause is not in its infancy. There are cases as far back as 1905 analyzing this provision. Contrary to Justice Chambers' view, we are not in a better position to determine its meaning than were all of the jurists who have preceded us. We do not do justice to the precedent created by this court when we announce a new constitutional analysis that conflicts with our historical analysis and with the significant body of law that has existed for nearly the entirety of this state's existence. We should not simply ignore what has been said in favor of what we think ought to have been said. Such an approach is directly at odds with the often recognized precept that an interpretation of the state constitution made closest to the adoption of that document provides the best evidence of the drafters' intent.

---

[16] Similarly, in *State v. Jackson*, 150 Wn.2d 251, 76 P.3d 217 (2003), we noted that it was settled that an independent state constitutional analysis applies in the search and seizure context under article I, section 7, but we did not revisit *Gunwall* to determine how to interpret or apply the provision.

[17] The concurrence in the dissent engages in the same mistake.

*See State ex rel. Gallwey v. Grimm*, 146 Wn.2d 445, 462, 48 P.3d 274 (2002); *Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 120, 937 P.2d 154, 943 P.2d 1358 (1997); *State v. Reece*, 110 Wn.2d 766, 779, 757 P.2d 947 (1988); *see also, e.g., Gerberding v. Munro*, 134 Wn.2d 188, 199-201, 949 P.2d 1366 (1998); *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 645, 771 P.2d 711 (1989); *State ex rel. Gowan v. Superior Court*, 81 Wash. 18, 20, 142 P. 452 (1914). *See generally* Robert F. Utter, *Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights*, 7 U. PUGET SOUND L. REV. 491, 521 (1984).

¶60 We do not write on a clean slate. Rather, contrary to the view expressed in the concurrence in the dissent, this court has historically found the privileges and immunities clause implicated under an independent state analysis when the law granted a special benefit or a special exemption to a favored minority class, i.e., in cases of undue favoritism. *See, e.g., In re Application of Camp*, 38 Wash. 393, 80 P. 547 (1905) (city ordinance prohibiting anyone from peddling fruits and vegetables within city but exempting farmers who grew the produce themselves violated article I, section 12 as granting privilege to a class of citizens); *City of Spokane v. Macho*, 51 Wash. 322, 98 P. 755 (1909) (Spokane ordinance regulating employment agencies was unconstitutional because it imposed criminal penalties on such entities engaging in false pretenses but not on other companies engaging in similar conduct); *City of Seattle v. Dencker*, 58 Wash. 501, 108 P. 1086 (1910) (Seattle ordinance unconstitutional under article I, section 12 where it imposed a tax on the sale of certain goods by machine but not on merchants selling the same goods); *State v. Robinson Co.*, 84 Wash. 246, 146 P. 628 (1915) (state law that exempted cereal and flour mills from its provisions and authorized them to sell mixed feeding stuffs while placing conditions on other persons, companies, corporations, or agents selling the same thing violated article I, section 12); *Sherman Clay & Co. v. Brown*, 131 Wash. 679, 231 P. 166 (1924) (Seattle ordinance prohibiting secondhand dealers

from disposing of goods for 10 days after purchase or receipt but exempting purchasers of stoves, furniture, or total contents of house violated article I, section 12 as being discriminatory as exempting a class within a class); *State ex rel. Bacich v. Huse*, 187 Wash. 75, 59 P.2d 1101 (1936) (act forbidding issuance of licenses to take salmon by gill nets except for those holding licenses in 1932 and 1933 set up arbitrary classification and conferred special privileges on those entitled to licenses in violation of article I, section 12), *overruled on other grounds by Puget Sound Gillnetters Ass'n v. Moos*, 92 Wn.2d 939, 603 P.2d 819 (1979); *Pearson v. City of Seattle*, 199 Wash. 217, 90 P.2d 1020 (1939) (ordinance imposing license tax on solid fuel dealers plus additional amount for each solid fuel truck where liquid fuel dealers were not subjected to such fees was discriminatory and violated article I, section 12); *City of Seattle v. Rogers*, 6 Wn.2d 31, 106 P.2d 598 (1940) (ordinance making it unlawful to conduct a charity campaign without licenses where part of the proceeds was withheld as compensation for promoters and solicitors violated article I, section 12, where ordinance exempted the Seattle Community Fund); *Ralph v. City of Wenatchee*, 34 Wn.2d 638, 209 P.2d 270 (1949) (ordinance requiring license fees for only nonresident photographers violated article I, section 12); *Larson v. City of Shelton*, 37 Wn.2d 481, 224 P.2d 1067 (1950) (statute permitting honorably discharged veterans to peddle and sell goods after obtaining free license, where others were required to pay license fees, violated article I, section 12); *Kaufman v. West*, 133 Wash. 192, 233 P. 321 (1925); *Verino v. Hickey*, 135 Wash. 71, 237 P. 5 (1925).[18]

¶61 Despite these cases and the consistent application of article I, section 12 they reflect, the concurrence in the

---

[18] Of course, even if there is a distinction between classes that gives rise to an article I, section 12 inquiry, the provision is not violated if there is a sufficient basis for the distinction. *See, e.g., State v. Sharpless*, 31 Wash. 191, 71 P. 737 (1903); *Bussell v. Gill*, 58 Wash. 468, 108 P. 1080 (1910); *Record Publ'g Co. v. Monson*, 123 Wash. 569, 213 P. 13, 215 P. 71 (1923); *City of Spokane v. Coon*, 3 Wn.2d 243, 100 P.2d 36 (1940); *Bauer v. State*, 7 Wn.2d 476, 110 P.2d 154 (1941); *see also Lenci v. City of Seattle*, 63 Wn.2d 664, 388 P.2d 926 (1964); *Sparkman & McLean Co. v. Govan Inv. Trust*, 78 Wn.2d 584, 478 P.2d 232 (1970).

dissent says that the privileges and immunities clause does not distinguish between grants of favoritism to minorities and majorities. But it cites not one case where this court has actually applied article I, section 12 independently in this way, and certainly none from the early years of statehood. The concurrence in the dissent would be hard pressed to find a body of cases historically applying *an independent state constitutional analysis* under article I, section 12 that is not coextensive with the equal protection clause in any circumstances other than a grant of positive favoritism to a minority class. In addition, the concurrence in the dissent also misrepresents, as does the majority, the court's decision in *Grant County*.

¶62 Finally, the concurrence in the dissent relies on Justice Utter's "well reasoned concurrence in [*State v.*] *Smith*[, 117 Wn.2d 263, 282, 814 P.2d 652 (1991) (Utter, J., concurring)]." Concurrence in dissent at 128 n.26. But Justice Utter observed:

> Enacted after the Fourteenth Amendment, state privileges and immunities clauses were intended to prevent people from seeking certain privileges or benefits to the disadvantage of others. The concern was prevention of favoritism and special treatment for a few, rather than prevention of discrimination against disfavored individuals or groups.

*Smith*, 117 Wn.2d at 283 (Utter, J., concurring). My concurrence is fully in keeping with this historically accurate observation, as well as with the cases decided by this court. Unlike the concurrence in the dissent, I do not believe the court should disregard the cases historically carrying out the framers' intent to prohibit positive favoritism, particularly when the cases gave independent effect to article I, section 12.

¶63 It is entertaining to think about different interpretations that "might" have been given to article I, section 12, but the course was set long ago.

¶64 The implicit concern that discriminatory laws favoring majorities will go unchecked is unwarranted because

both article I, section 12 and the equal protection clause apply in such cases, albeit under an identical analysis.

## CONCLUSION

¶65 The majority misreads *Grant County* to say that an independent state constitutional analysis is always appropriate under article I, section 12. The court intended an independent analysis only where a grant of positive favoritism to a minority class is at issue. This is born out by the discussion in *Grant County* as well as by early cases decided under article I, section 12. As we recognized in *Grant County*, 150 Wn.2d at 809 n.12, article I, section 12 has required "invalidat[ion of] laws granting special advantages to certain people or classes of people."

¶66 I am concerned that the majority's discussion of state constitutional analysis may lead counsel to simply repeat all or part of the six-factor *Gunwall* analysis after it is settled that an independent analysis is appropriate. Rather than a rehash of the *Gunwall* factors, counsel and litigants should provide the court with their best legal assessment of and authority for interpreting and applying the state constitutional provision in a particular way, guided, where possible, by our decisions in that area.

¶67 I concur in the result of the majority, but not in its constitutional analysis.

¶68 J.M. JOHNSON, J. (concurring) — The Washington Constitution provides that "[a]ll persons convicted of infamous crimes unless restored to their civil rights . . . are excluded from the elective franchise." CONST. art. VI, § 3. Respondents argue that requiring them to pay their legal financial obligations (LFOs), including restitution to victims, before such restoration of rights violates our constitution's privileges and immunities clause.[19]

¶69 Despite prior case law establishing a sound, historical, and relatively simple approach to application of

---

[19] CONST. art. I, § 12.

our constitution's privileges and immunities clause, the majority errs in its analysis. However, the majority ultimately reaches the correct result. Thus, I concur in the majority's conclusion that "Washington's disenfranchisement scheme does not violate the privileges and immunities clause of the Washington Constitution." Majority at 88. I write separately to articulate the proper application of article I, section 12 to the present case.

¶70 The majority correctly notes that this court has previously held that article I, section 12 " 'requires an independent constitutional analysis.' " Majority at 94 (quoting *Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 150 Wn.2d 791, 811, 83 P.3d 419 (2004) (*Grant County II*)). Thus, there is no need to conduct a *Gunwall*[20] analysis. Majority at 94-95 (citing *State v. White*, 135 Wn.2d 761, 769, 958 P.2d 982 (1998)). However, as noted by Justice Madsen in her separate concurrence, the majority errs in suggesting that an appropriate independent constitutional analysis involves a reiteration of the *Gunwall* factors as applied to the state constitutional provision at issue. Concurrence (Madsen, J.) at 112-13. Instead, an independent examination of article I, section 12 should be conducted in accordance with its plain language. The majority further errs in concluding that respondents' article I, section 12 claim implicates the "privilege" of voting. Majority at 95. Because convicted felons are excluded from the elective franchise in Washington under our constitution, no "privilege or immunity" is granted or withheld by Washington's re-enfranchisement scheme.[21] *See* CONST. art. VI, § 3. Thus, respondents' claim must fail.

¶71 Article I, section 12 provides as follows: "No law shall be passed granting to any citizen, class of citizens, or

---

[20] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).

[21] The majority consistently refers to the statutory scheme at issue as Washington's "disenfranchisement scheme." Majority at 91. However, because this statutory scheme actually provides for the reinstatement of voting rights, which have been lost under the constitution as a result of a felony conviction, I believe "re-enfranchisement scheme" is a more appropriate appellation.

corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations." The plain language of this provision requires a two-part analysis: "(1) Does a law grant a citizen, class, or corporation 'privileges or immunities,' and if so, (2) Are those 'privileges or immunities' equally available to all?" *Andersen v. King County*, 158 Wn.2d 1, 59, 138 P.3d 963 (2006). "[I]f no 'privilege or immunity' is granted by the challenged law . . . , the clause has no application and the second question is never reached." *Id.*; *see also Grant County* II, 150 Wn.2d at 812 ("For a violation of article I, section 12 to occur, the law, or its application, must confer a privilege to a class of citizens.").

¶72 Respondents contend that because Washington law prohibits voting by felons who have not paid their LFOs, it somehow confers a privilege upon wealthy felons while withholding that privilege from poor felons. The fundamental flaw in respondents' argument is that the "privilege" to vote does not extend to felons under Washington law.

¶73 This court has defined "privileges and immunities" as " 'those fundamental rights which belong to the citizens of the state by reason of such citizenship.' " *Grant County* II, 150 Wn.2d at 813 (quoting *State v. Vance*, 29 Wash. 435, 458, 70 P. 34 (1902)). More specifically, the phrase "privileges and immunities" has historically been understood to encompass:

> Protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety; subject nevertheless to such restraints as the government may justly prescribe for the general good of the whole. The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to institute and maintain actions of any kind in the courts of the state; to take, hold and dispose of property, either real or personal; . . . an exemption from higher taxes or impositions than are paid by the other citizens of the state [and] *the*

*elective franchise, as regulated and established by the laws or constitution of the state in which it is to be exercised.*

*Corfield v. Coryell*, 6 F. Cas. 546, 551-52 (E.D. Pa. 1823) (No. 3230) (emphasis added); *see also Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 145 Wn.2d 702, 747, 42 P.3d 394 (2002) (Sanders, J., dissenting) (*Grant County* I); *Saenz v. Roe*, 526 U.S. 489, 521, 119 S. Ct. 1518, 143 L. Ed. 2d 689 (1999) (Thomas, J., dissenting). Although the above definition was originally articulated with reference to the federal constitution, it is also relevant to this court's interpretation of article I, section 12. *See Vance*, 29 Wash. at 458 (indicating that state law concept of "privileges and immunities" should be defined and interpreted similarly to federal concept).

¶74 The majority asserts that "[t]his court has previously recognized that the right to vote is a fundamental right afforded to the citizens of Washington State." Majority at 95 (citing *Foster v. Sunnyside Valley Irrigation Dist.*, 102 Wn.2d 395, 404, 687 P.2d 841 (1984)). This may be true, so far as it goes, but this statement does not address whether and to what extent voting is a "privilege" within the meaning of article I, section 12.[22] As indicated in *Corfield*, 6 F. Cas. at 552, the "privilege" of the elective franchise is inherently limited in scope according to the manner in which it is "regulated and established by the laws or constitution of the state." In Washington, the right to vote is regulated and established by multiple constitutional provisions. Even a cursory review of these provisions reveals that the "privilege" of voting does not extend to respondents.

---

[22] While it appears the appellants in *Foster* challenged the irrigation district's election scheme under article I, section 12, as well as article I, section 19, the scheme was expressly held unconstitutional solely under article I, section 19. *Foster*, 102 Wn.2d at 411. In its analysis, the *Foster* court did cite to an earlier decision by this court, *Malim v. Benthien*, 114 Wash. 533, 196 P. 7 (1921), which suggests that voting may be a "privilege" within the meaning of article I, section 12. However, the *Malim* court does not discuss the scope of the voting privilege established by Washington law, the key to deciding the present case.

¶75 As the majority correctly notes, "Article I, section 19 of the Washington Constitution prohibits interference with 'the free exercise of the right of suffrage.' " Majority at 95. However, this is far from the entirety of our state constitution's treatment of voting rights. All of article VI deals with this subject. Sections 1 and 3 of article VI are particularly relevant to the present case. Section 1 of article VI provides:

> All persons of the age of eighteen years or over who are citizens of the United States and who have lived in the state, county, and precinct thirty days immediately preceding the election at which they offer to vote, *except those disqualified by Article VI, section 3 of this Constitution*, shall be entitled to vote at all elections.

(Emphasis added.) Section 3 of article VI provides, in relevant part: "All persons convicted of infamous crime unless restored to their civil rights . . . are excluded from the elective franchise."

¶76 Read together, the above constitutional provisions clearly establish that under Washington law, citizens convicted of felonies[23] are excluded from the elective franchise unless and until they are restored to their civil rights. In other words, "the elective franchise, as regulated and established by the . . . constitution of [Washington]" does not extend to felons. *Corfield*, 6 F. Cas. at 552. Thus, in accordance with the historical understanding of "privileges and immunities," I conclude no "privilege" is implicated by Washington's re-enfranchisement scheme.

¶77 Because there is no constitutional privilege or immunity at stake, Washington's re-enfranchisement scheme cannot be found to violate article I, section 12. *See Grant County* II, 150 Wn.2d at 814 (where "there is no privilege . . . at issue in [the] case, . . . the claim of a violation of article I, section 12 fails for this reason"). Respondents may constitutionally be required to pay their LFOs, including

---

[23] Under RCW 29A.04.079, an "infamous crime" is defined as "a crime punishable by death in the state penitentiary or imprisonment in a state correctional facility." In other words, a felony.

restitution to victims,[24] before they will be extended the franchise in Washington. Since the majority ultimately concludes that respondents' challenge under the Washington privileges and immunities clause must fail and upholds Washington's constitutional system, I concur in the majority's disposition of this case.

SANDERS, J., concurs with J.M. JOHNSON, J.

¶78 ALEXANDER, C.J. (dissenting) — As a society, we should encourage, rather than discourage, felons to rehabilitate themselves. As members of this society, we all benefit when those who have failed in the past to fully live up to their responsibilities as a citizen become full-fledged citizens who again can exercise the cherished right to vote. We should all rejoice when they achieve that goal. Indeed, the legislature has indicated that it is the policy of this state "to encourage and contribute to the rehabilitation of felons and to assist them in the assumption of the responsibilities of citizenship." RCW 9.96A.010. Having set this laudable goal for felons, we should not prevent them from achieving it simply because they lack ability to pay legal financial obligations (LFOs).

¶79 The requirement that felons pay all their LFOs in full before they can regain the right to vote does just that, but only to a particular class of felons. Wealthy people who are convicted of a felony and are ordered to pay costs, fees, fines, or restitution can pay those LFOs immediately. When they do, they can regain the right to vote almost immediately upon the completion of the remaining conditions of their sentence. The same is true for felons who have friends or family who are willing and able to pay their LFOs. On the other hand, felons who lack the resources to pay their LFOs in full cannot recover their right to vote even after completing the remaining terms of their sentence.

---

[24] Requiring respondents to pay restitution to victims in particular also comports with the spirit of our constitution's victims' rights provision. *See* CONST. art. I, § 35.

¶80 Moreover, those felons without resources may never be able to pay their LFOs. It is, after all, difficult for a felon to get a job after release from confinement. Cherish M. Keller, Note, *Re-Enfranchisement Laws Provide Unequal Treatment: Ex-Felon Re-Enfranchisement and the Fourteenth Amendment*, 81 CHI.-KENT L. REV. 199, 212-13 & n.6 (2006) (citing Kathleen M. Olivares et al., *The Collateral Consequences of a Felony Conviction: A National Study of State Legal Codes 10 Years Later*, FED. PROBATION, Sept. 1996, at 10, 13). Furthermore, the majority of jobs available to them offer low wages for hard work. *See, e.g.*, Jennifer Leavitt, Note, *Walking a Tightrope: Balancing Competing Public Interests in the Employment of Criminal Offenders*, 34 CONN. L. REV. 1281, 1284-85 (2002). Disabilities may also prevent a felon from being able to work, as in the case of the three respondents here. This adds up to low incomes for many felons, a situation made worse if they must draw money from their meager income to make substantial payments for their LFOs. At the same time, interest continues to accrue on the LFOs, raising ever higher the amount to be paid. This traps felons into a position where they have little hope of regaining a basic right of citizenship and little motivation to try to regain full citizenship.

¶81 Although article VI, section 3 of the Washington Constitution indicates that all persons "convicted of infamous crimes" are ineligible to vote, the provision does not make that disenfranchisement permanent, even though the State would be entitled to do so. *See Richardson v. Ramirez*, 418 U.S. 24, 54-56, 94 S. Ct. 2655, 41 L. Ed. 2d 551 (1974). Having chosen to restore voting rights to those felons who have completed their sentence, the State may not discriminate against impoverished felons by setting payment of LFOs in the way of regaining voting rights. The United States Supreme Court has recognized this precise point, holding that when a state has discretion not to act but nonetheless chooses to act, it must undertake those actions "in accord with the dictates of the Constitution." *Evitts v. Lucey*, 469 U.S. 387, 401, 105 S. Ct. 830, 83 L. Ed. 2d 821

124

(1985); *see also Griffin v. Illinois*, 351 U.S. 12, 18, 76 S. Ct. 585, 100 L. Ed. 891 (1956) (explaining that a state cannot exercise its discretion "in a way that discriminates against some convicted defendants on account of their poverty"). Because, for reasons I set forth hereafter, I find the withholding of the fundamental right to vote on the basis of inability to pay LFOs violates the equal protection clause of the United States Constitution, I would affirm the trial court.

Voting Is a Fundamental Right

¶82 The right to vote is a fundamental right afforded to citizens. *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 667, 86 S. Ct. 1079, 16 L. Ed. 2d 169 (1966); *Reynolds v. Sims*, 377 U.S. 533, 561-62, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964). It is the manner in which " 'other basic civil and political rights' " are preserved. *Harper*, 383 U.S. at 667 (quoting *Reynolds*, 377 U.S. at 562).

¶83 The majority rejects recognition of felons' right to vote as a fundamental right. It bases its determination on cases holding that a felon's right to vote may be taken away under the Fourteenth Amendment, section 2. This case is not, however, about felon disenfranchisement. Rather, it is a case about felon re-enfranchisement.

¶84 The United States Supreme Court has decided two cases in which convicts were deprived of their freedom for failure to pay their legal financial obligations. *Bearden v. Georgia*, 461 U.S. 660, 103 S. Ct. 2064, 76 L. Ed. 2d 221 (1983); *Williams v. Illinois*, 399 U.S. 235, 90 S. Ct. 2018, 26 L. Ed. 2d 586 (1970). Although freedom is a fundamental right, *Foucha v. Louisiana*, 504 U.S. 71, 86, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992) (plurality opinion), it is recognized that freedom can be taken away as punishment for a felony. *Bearden*, 461 U.S. at 669. However, once all of the assigned punishment has been imposed, except for the payment of financial obligations, failure to pay those financial obligations cannot be used to continue depriving felons of their

freedom. *Bearden*, 461 U.S. at 672-73; *Williams*, 399 U.S. at 241-42. Freedom, thus, remains a fundamental right.

¶85 Just as freedom is a fundamental right, so is the right to vote. These are rights that are possessed by citizens of a state. Just as in the other cases, felons can be deprived of the right to vote, notwithstanding its fundamental nature, as punishment for a felony. However, voting remains a fundamental right, and when all other conditions of a sentence have been fulfilled, felons cannot be deprived further of their right to vote for failure to pay LFOs.

### Violation of the Equal Protection Clause

¶86 Here, felons remain disenfranchised based solely on their ability or inability to pay LFOs. The United States Supreme Court has held that denying one the right to vote due to his or her inability to pay a fee is unconstitutional: "We conclude that a State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard." *Harper*, 383 U.S. at 666. The Court reasoned that "[v]oter qualifications have no relation to wealth nor to paying or not paying [a] tax." *Id*. Thus, the United States Supreme Court struck down poll taxes, which required individuals to pay a fee or tax in order to vote.[25]

¶87 The majority claims that the reasoning in *Harper* does not apply to felons or ex-felons because section 2 of the Fourteenth Amendment makes their right to vote nonfundamental. This is contrary to my conclusion above.

---

[25] In 2001, a newspaper editor and NAACP (National Association for the Advancement of Colored People) branch president called the continuing disenfranchisement of felons who have completed their incarceration, parole, or probation " 'the modern day poll tax.' " J. Whyatt Mondesire, *Felon Disenfranchisement: The Modern Day Poll Tax*, 10 Temp. Pol. & Civ. Rts. L. Rev. 435, 437 (2001). He based his assessment on the enormous number of "ex-offenders" who remain unable to regain their right to vote and on the disproportionate number of them who are African American. *Id.* at 436. In effect, the scheme the majority upholds today works the same as a poll tax, requiring well-meaning felons who have served their time to "pay to play."

Furthermore, even a court that found felons do *not* have a fundamental right to vote rejected the majority's conclusion:

> [W]e are similarly unable to accept the proposition that section 2 removes all equal protection considerations from state-created classifications denying the right to vote to some felons while granting it to others. No one would contend that section 2 permits a state to disenfranchise all felons and then re-enfranchise only those who are, say, white. Nor can we believe that section 2 would permit a state to make a completely arbitrary distinction between groups of felons with respect to the right to vote.

*Shepherd v. Trevino*, 575 F.2d 1110, 1114 (5th Cir. 1978).

¶88 Again, a comparison to *Williams* is useful. In *Williams*, a felon was sentenced to the maximum incarceration period of one year and a fine. Because Williams was indigent, he was unable to pay the fine. As a result, he remained incarcerated for an additional 101 days to work off the fine, pursuant to a statute equating a day of imprisonment to $5. The Court recognized that the felon had received his sentence due to his criminal act and not because he was indigent. However, it went on to conclude:

> [T]he Illinois statute as applied to Williams works an invidious discrimination solely because he is unable to pay the fine. On its face the statute extends to all defendants an apparently equal opportunity for limiting confinement to the statutory maximum simply by satisfying a money judgment. In fact, this is an illusory choice for Williams or any indigent who, by definition, is without funds. Since only a convicted person with access to funds can avoid the increased imprisonment, the Illinois statute in operative effect exposes only indigents to the risk of imprisonment beyond the statutory maximum. By making the maximum confinement contingent upon one's ability to pay, the State has visited different consequences on two categories of persons since the result is to make incarceration in excess of the statutory maximum applicable only to those without the requisite resources to satisfy the money portion of the judgment.

*Williams*, 399 U.S. at 242 (footnote omitted). Likewise, the requirement that LFOs be paid before voting rights are

restored serves to extend the punishment of felons who lack the resources to pay the LFOs.

¶89 The injustice this works is obvious. As respondents point out, "If the state sentencing guidelines said that judges should sentence wealthy felons to five years incarceration followed by immediate restoration of rights and sentence poor felons to five years incarceration followed by lifetime disenfranchisement, the equal protection problem would be apparent." Br. of Resp'ts/Cross Appellants at 24. Although the majority is correct in stating that the State need not " ' "eliminate all inequalities between the rich and the poor," ' " majority at 104 (quoting *In re Pers. Restraint of Runyan*, 121 Wn.2d 432, 449, 853 P.2d 424 (1993) (quoting *Riggins v. Rhay*, 75 Wn.2d 271, 283, 450 P.2d 806 (1969))), it cannot *create* such inequalities by tying voting to the ability to pay. To do so violates the "fundamental fairness required by the Fourteenth Amendment." *Bearden*, 461 U.S. at 673.

¶90 Accordingly, I respectfully dissent.

C. JOHNSON and CHAMBERS, JJ., concur with ALEXANDER, C.J.

¶91 CHAMBERS, J. (concurring in dissent) — I concur in Chief Justice Alexander's well reasoned dissent. Washington's felon disenfranchisement statute violates the state and federal constitutions because it discriminates against the poor.

¶92 I write separately to respond to my learned colleague Justice Madsen. For the reasons I laid out last year when we considered whether the State could constitutionally refuse to recognize same sex marriages, and for the reasons set forth by Justice Utter before me, I believe our state privileges and immunities clause forbids distributing fundamental rights on unequal terms. *See* CONST. art. I, § 12 ("No law shall be passed granting to any . . . class of citizens . . . privileges or immunities which upon the same terms shall not equally belong to all citizens. . . ."); *Andersen v. King County*, 158 Wn.2d 1, 120-28, 138 P.3d 963 (2006) (Chambers, J., concurring in dissent); *State v. Smith*, 117 Wn.2d 263, 283, 814 P.2d

652 (1991) (Utter, J., concurring). Nothing in the *Grant County* opinion I signed says otherwise. *Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 150 Wn.2d 791, 83 P.3d 419 (2004). I applaud the majority for not perpetuating the notion that it did. *See* majority at 97.[26]

¶93 The text of our constitution does not distinguish between a statute that gives extra helpings of privileges to majorities or to minorities. CONST. art. I, § 12. It prohibits both and we should too. *See Smith*, 117 Wn.2d at 283-91 (Utter, J., concurring). The statute before us, in effect, restricts re-enfranchisement to those rich enough to buy it. That grants one class of citizens, the comparatively wealthy, a privilege that does "not equally belong to all citizens." CONST. art. I, § 12. That is an unconstitutionally unequal distribution of a basic, fundamental right; the "democratic

---

[26] Again, I must respectfully disagree with my learned colleague, Justice Madsen, about what this court held in *Grant County. See Andersen*, 158 Wn.2d at 125-26 (Chambers, J., concurring in dissent). I find much comfort in Justice Utter's well reasoned concurrence in *Smith* where he eloquently demonstrated why we should not defer to federal equal protection analysis when interpreting our own privileges and immunities clause. It is probably true that the *motivation* for our own privileges and immunities clause was our founders' well founded desire to establish a state where government benefits were not handed out to the special favorites of the legislature. But, as I have said before, the clause is plainly written to have a broader application. *Andersen*, 158 Wn.2d at 123-24 (Chambers, J., concurring in dissent).

My learned colleague is certainly correct in implying that our body of state constitutional law is woefully small. But this is because state courts have only recently rediscovered their own state constitutions. *See generally* Robert F. Utter, *State Constitutional Law, the United States Supreme Court, and Democratic Accountability: Is There a Crocodile in the Bathtub?*, 64 WASH. L. REV. 19, 30 n.67 (1989) (citing William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 HARV. L. REV. 489, 501-02 (1977)). I strongly believe we should not substitute federal constitutional jurisprudence for our own merely because we have in the past used it without considering whether our own constitution would demand a different approach. *See generally* Hans A. Linde, *First Things First: Rediscovering the States' Bills of Rights*, 9 U. BALT. L. REV. 379 (1980).

Finally, I do not read the cases my learned colleague cites as being either supportive or persuasive of the proposition that our independent privileges and immunities analysis under our state constitution should be limited to times when legislation favors a minority class.

system's coin of the realm";[27] the basic, fundamental right to cast a ballot.

¶94  I respectfully concur in dissent.

---

[27] *Richardson v. Ramirez*, 418 U.S. 24, 83, 94 S. Ct. 2655, 41 L. Ed. 2d 551 (1974) (Marshall, J., dissenting).